[No. S054372. Dec. 7, 2009.]

THE PEOPLE, Plaintiff and Respondent, v.
DENNIS NEWTON ERVINE, Defendant and Appellant.

748

750

## Counsel

Michael J. Hersek, State Public Defender, under appointment by the Supreme Court, and Douglas Ward, Deputy State Public Defender, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Charles A. French, Patrick J. Whalen and Laura Wetzel Simpton, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**BAXTER, J.**—After his motion for change of venue was granted, defendant Dennis Newton Ervine was convicted by a Sacramento County jury of the first degree murder of Lassen County Deputy Sheriff Larry Griffith and the attempted willful, deliberate and premeditated murders of Commander William Freitas, Deputy Wayne Aldridge, and Deputy Henry Mahan, all by use of a firearm. (Pen. Code, §§ 187, subd. (a), 664, subds. (a), (e), 1203.06, 12022.5.)[1] The jury found true the special circumstances that defendant

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

murdered a peace officer in the line of duty (§ 190.2, subd. (a)(7)), that defendant committed the murder to avoid arrest (*id.*, subd. (a)(5)), and that defendant committed the murder by means of lying in wait (*id.*, subd. (a)(15)). After a penalty trial, the jury returned a verdict of death on March 6, 1996. The court denied defendant's motions for new trial (§ 1181) and to modify the penalty verdict (§ 190.4, subd. (e)) and sentenced defendant to die. Defendant was also sentenced to three consecutive sentences of life imprisonment without the possibility of parole and an additional term of 16 years. This appeal is automatic.

We affirm the judgment in its entirety.

## I. BACKGROUND

Commander William Freitas and Deputy Sheriffs Wayne Aldridge, Larry Griffith, and Henry Mahan of the Lassen County Sheriff's Department drove to defendant's residence on the morning of March 2, 1995, following a report of an incident of domestic violence the night before by his wife, Julie Ervine. They were in marked patrol vehicles and in uniform. Defendant, who had barricaded the downstairs windows and watched the officers' arrival from an upstairs bedroom, responded by firing his .30-.30 Winchester rifle at the officers, killing Deputy Griffith. Defendant continued to fire his weapon until a bullet from one of the officers grazed his head. After a standoff of several hours, the surviving officers were evacuated under cover of a dump truck. Defendant surrendered several hours after that.

### Guilt Phase Evidence

On March 2, 1995, Wayne Aldridge was awakened by a call from the Lassen County Sheriff's Department dispatcher around 3:45 a.m. The dispatcher told Aldridge, the on-call deputy, that a woman had reported a domestic violence situation at her home in Ravendale, during which a gun was fired. Aldridge put on his uniform—dark brown slacks and a khaki-colored shirt with Lassen County Sheriff's Department patches on each shoulder, dark brown epaulets, dark brown pocket covers, and a badge on the upper left chest—and met Deputy Larry Griffith at the sheriff's department in Susanville. Griffith was also in uniform. The reporting party was identified as Julie Ervine, and the officers were dispatched to meet her at the post office in Ravendale, about 60 miles away. They drove in a marked patrol car—a brown 1994 Ford Crown Victoria with Lassen County Sheriff's Department insignia on each side, a sheriff's logo on the rear, and red and blue overhead lights—and arrived around 5:30 a.m. Julie Ervine (Julie) was there, dressed in a bathrobe and accompanied by her neighbor, John Boske.

Julie reported that defendant had seemed strange when she returned home around 9:00 p.m. the night before. He had been cleaning a semiautomatic

rifle, despite the late hour and despite the fact he had recently cleaned it. About an hour later, they argued. He demanded the keys to her car, ostensibly to repair the windshield wiper on the rear window. Julie pointed out that the wiper had been "messed up" for two years. As the argument escalated, Julie announced she was going to leave him. Defendant entered the bedroom, grabbed her by the neck, and threw her on the bed. He then pulled out a silver-colored semiautomatic handgun and pressed it against her left cheek. When he said he ought to kill her right there, she tried to talk her way out of the situation. He pulled the gun away, fired a round into a stuffed toy dinosaur that was near her head, and left the room. Julie, clad only in her bathrobe, climbed out the bathroom window. However, she made a noise closing the window, and defendant rushed in and saw her escape. She ran towards the rear of the house and hid in the sagebrush. From her position, she could see defendant moving vehicles around at the front of the house, so she crawled to the Boske residence, approximately half a mile away to the south.

Upon hearing this account, Deputy Aldridge decided to call for backup and the two officers, accompanied by Julie and her neighbor, went to the Boske residence to do so. Aldridge parked the patrol car in front, with its rear facing defendant's residence. There was a clear view between the residences. Reached by phone, Commander Freitas instructed Aldridge and Griffith to continue to observe the Ervine residence and said that he would "gather the troops" in the meantime. Through his binoculars, Aldridge saw defendant shuttle back and forth between the Ervine house and a red car, which was the vehicle parked closest to the house. Griffith went outside the Boske house with another pair of binoculars and watched defendant, who in turn was watching the two deputies through his own pair of binoculars. Defendant continued to watch them for about a minute and then went into the house and up the stairs, where he observed them through his binoculars for another minute.

Meanwhile, Commander Freitas tried to telephone defendant's house, but defendant never picked up the phone and the answering machine message was garbled. Freitas and Deputy Henry Mahan then drove to the Boske residence and parked their patrol vehicle directly behind Aldridge's vehicle. They were wearing the same uniforms as Aldridge and Griffith. Julie described to them the weapon defendant had used the previous night, which appeared to be a .22-caliber semiautomatic, as well as other weapons defendant possessed. As to defendant's state of mind, Julie told the officers that he "had lost it." The four officers got back into their vehicles and headed towards defendant's house around 9:00 a.m., intending to arrest him for felony domestic violence.

The deputies proceeded down the Ervines' long driveway towards the Ervines' fenced-in yard, with Freitas's car in the lead. Outside again,

defendant watched them for a time and then walked toward and reentered his residence as the deputies approached, turning once or twice to look back as he did so. Freitas and Mahan stopped at the locked gate and exited their vehicle. They yelled to defendant to come and talk. Aldridge and Griffith parked behind them and at an angle. Aldridge pulled out his binoculars and observed defendant at a second-story window with what appeared to be a weapon. Aldridge warned the others and opened his car door. Griffith exited Aldridge's vehicle on the passenger side and knelt down. Defendant came closer to the second-story window, used his weapon to knock a hole in it, and immediately began firing.

Freitas ducked behind his car door and heard two quick shots fired by defendant, who had a tactical advantage by being able to fire down from above the officers, approximately 187 feet away. Although there was some dispute at trial over the sequence of the subsequent shots, the record showed that defendant fired in Freitas's direction at least twice; that defendant fired another shot that grazed the top of Mahan's head as well as firing other shots in Mahan's direction; that defendant shot Griffith in the head; and that Aldridge, who tried to find a vantage point but could not because the lead patrol vehicle's rear window and light bar were in the way, took cover in the "V" of his open vehicle door.[2] The record also showed that Griffith managed to fire a single round from his M16 rifle before being shot; that Freitas returned defendant's fire using his .45-caliber semiautomatic pistol; and that Mahan used his shotgun to fire once at defendant. After the shotgun was fired, defendant appeared to roll backwards away from the window, leading Mahan to think defendant had been knocked down. The entire encounter lasted about 10 to 15 seconds.

As Commander Freitas moved towards the rear of his vehicle to retrieve his sniper rifle, he saw that Deputy Griffith had been hit in the head. Freitas was sure Griffith was dead and told Aldridge, "We've got an officer down. Call 1199," using an emergency code indicating an officer in trouble. Aldridge thought that Mahan must have been the victim because he did not see Mahan at first, but, as Aldridge grabbed his car radio to report the 1199 call, he saw Mahan do the same thing in the lead vehicle. Aldridge then noticed a piece of skull membrane on his radio and "pink material" splashed on the front seat and elsewhere in the car's interior and called out to Griffith. There was no response. Aldridge dropped down to the ground and saw Griffith lying on the ground on the other side of the vehicle. There was an exit wound at the back of his head.

---

[2] Bullets from defendant's rifle also struck the driver's side hood and the spotlight on Freitas's vehicle, and blew out the passenger side rear window in Aldridge's vehicle.

After the shooting stopped, defendant did not reappear at the window or otherwise communicate with the officers, and they were concerned that defendant, a veteran of the Vietnam War, might come out of the house and pick them off from behind. The patrol vehicles constituted the only cover available to the officers, and they were pinned down, unable to move, for three hours. The sheriff's department finally obtained a dump truck with a snowplow blade on the front. The truck backed down the entire length of the Ervines' driveway, with its bed (filled with sand) tilted up as a shield, and the surviving officers climbed into or onto the vehicle to make their escape. Sniper teams were then set up at the four corners of the house. Several hours later, around 6:00 p.m., defendant surrendered. As he exited his property, he paused for several seconds at Griffith's body, which had remained the entire day where it had fallen.

When taken into custody, defendant had a nonserious puncture-type wound, about two millimeters long, on his upper left forehead.

An investigation at the scene revealed that defendant had placed several five-gallon gasoline cans at various spots in the yard which could be seen from inside the residence, including a can placed on top of the red Toyota in front of the residence, a can placed next to a pickup truck parked near the fence, a can placed near a blue truck west of the residence, and a can placed near an old army ambulance parked near an outbuilding at the front corner of the yard. There was also a five-gallon gasoline can inside the residence near the entry to the living room.

Weapons and ammunition of every variety were found throughout the house. There were cartridges of .30-.30-caliber, .357-caliber Magnum, and .38-caliber ammunition in the living room. In the dining room were found a loaded 12-gauge shotgun and .32-caliber semiautomatic pistol, an unloaded .30-.30 Winchester rifle,[3] a .357 Magnum speed loader with six cartridges, a partial box of .357 Magnum cartridges, a box of 12-gauge shotgun shells, a box of .32-caliber automatic ammunition, a box of .32-caliber Smith & Wesson ammunition, and a box of .30-.30 cartridges (and other such cartridges). The master bedroom contained .22-caliber, .30-.30-caliber, .357-caliber, and .38-caliber ammunition, as well as a .22-caliber rifle, a .357 Magnum Colt Python revolver, and a second .30-.30-caliber rifle, this one with a leather sling.

---

[3] A bullet recovered from Aldridge's vehicle's passenger side door was tested as consistent with having been fired by this rifle, which was cocked but not loaded when recovered. This rifle, which also had some bloodstains on it and fresh scratches on the butt end, had a lighter trigger pull than a second .30-.30 rifle, which was found in the master bedroom. The lighter trigger pull would have made the first rifle easier to fire with accuracy than the second rifle.

Plywood covered the windows in the living room, dining room, master bedroom, and kitchen, and some of it was buttressed by two-by-four wood boards. Plywood also covered the back door, which led to the kitchen. A stuffed "Barney toy" lay in the kitchen; it had a hole through the head from back to front and the inside material had melted. The screen on the bathroom window had been knocked out and was lying on the ground.

A portion of a south-facing window in the upstairs bedroom had been broken from the inside, and there were a flashlight, a bullhorn, and binoculars on a cardboard box below the window. There were four spent .30-.30 casings on the bedroom floor, as well as some .45-caliber bullets, pellets of double-aught buckshot, and a series of blood drops.

Deputy Griffith died of a gunshot wound to his head. The bullet entered at the hairline on the right side of his head and exited at the left rear of his head; the trajectory was from right to left on a downward path. The size of the entry wound corresponded to a .30-.30-caliber bullet.

Defendant denied knowing that the men arriving at his house were peace officers and denied any intent to shoot them. He believed instead that the visitors were his wife, whom he suspected of having an affair and of taking his life savings, and her boyfriend; he claimed he did not realize that they were from the sheriff's department (and that he had shot one of them) until much later.

Defendant had many complaints about his wife. He had been trying to sell their Sacramento house—the title of which was in her name alone—but she reportedly failed to answer repeated messages on behalf of an interested buyer left on her home phone in Ravendale or at her work at the Lassen County school district. He also had told her a foreclosure notice had been posted on the Sacramento house in December 1994. She promised to straighten it out, but she must not have, since another foreclosure notice was posted on the house a month later. He also learned that the $29,000 he had inherited from his father was gone and that he had less than $120 in his bank account. Julie was supposedly the one who paid the bills.

Defendant had finished moving his belongings from Sacramento to Ravendale on Valentine's Day 1995. In late February, he discovered that the key to the box containing his coin and stamp collections and some cash was missing from its place in the nightstand. Julie claimed that she would find the key, but defendant instead picked the lock and discovered that all but $97 of his $2,500 in cash was missing.

When Julie arrived home around 9:30 p.m. on March 1, 1995, defendant was trying to fix a .22-caliber semiautomatic rifle he had obtained from a

friend in a trade. He then put the gun away and asked his wife for a haircut, since he was interested in pursuing some job openings listed in the newspaper and she was the one who ordinarily cut his hair.[4] Julie said she was tired and told him the scissors were on the dresser, but he complained that he could not cut his own hair. He also asked her for $10 or $20 to buy gas, but she said she did not have any money.

Defendant returned the gun repair tools to the basement and brought up a wiper blade he had purchased in Sacramento for her car's rear window. He asked where the "arm" for the wiper blade was, since he insisted on getting the chore of changing the blade out of the way, but they got into a heated argument over her privacy, the house in Sacramento, the mail, and his coin collection. When she said, "Fine, I'm leaving," defendant grabbed the Colt Python .357-caliber double-action revolver and stuck it in her face. She said, "Go ahead and kill me. Then you really won't have anything." He replied, "I wouldn't kill you. I would make you suffer, but I wouldn't kill you."[5] He used the gun to push away a stuffed animal the dog had placed on the bed, and the gun "went off." Defendant checked to make sure the dog had not been shot, and Julie screamed, "I can't believe you shot that F-in' thing next to my head." He told her she could leave, but not with the red car (i.e., her car), which he planned to sell in Sacramento. When defendant discovered that Julie had escaped out the bathroom window, he got into his truck and backed it in front of her car to block its exit.

Once Julie left, defendant entered her car and found bags containing mail from the preceding three months. He also found bottles of prescription pain medicine (many of them in the name of his late father), as well as bills for credit cards in his name that he did not know he had, men's clothing (not his), a shoulder pad for a woman's garment with Julie's wedding ring pinned to it, Post-it notes that read "Can you squeeze me?" and "Can you find time for me today, Mike?" and a log of her workdays, the longest of which was 5.5 hours—even though she routinely left for work around 7:30 or 8:00 a.m. and did not return until 8:00 p.m. or later.

While sorting through the mail, defendant retrieved one of his loaded .30-.30 Winchester rifles—the one without the sling—because he planned to go looking for his wife (and "probably" kill her) but, for undisclosed reasons, he did not actually go looking for her. Instead, he went back to her car. When he discovered through bank statements that she had been taking his coin collection and depositing it in the bank and that he had less than $2 left in his

---

[4] Defendant had not been employed since 1991 or 1992 but had been buying and selling government surplus.

[5] At trial, defendant said he did not know at the time whether he wanted to shoot his wife, but he did want to scare her.

bank account, he barricaded all of the first-floor windows (except the mudroom window) with plywood: "I was just gonna shut myself off from the rest of the world." Defendant denied erecting the barricades to deflect police bullets. As he was going back and forth to the car, he noticed a brown or beige car at the Boske residence and assumed it was Julie's boyfriend's. Defendant then brought a number of items upstairs: a flashlight, "because it was just starting to get daylight, and it was dark in the room"; a bullhorn, because he planned to tell Julie, when she came back, to "just take one of those trucks and leave" without letting her back in the house (although, as he admitted, he used the .30-.30 rifle instead of the bullhorn when the deputies arrived and could not say why he did so); and binoculars, so that he could see what was going on across the street and who was there (but, he claimed, these "wouldn't even be good at a football game"). He also took the .30-.30 Winchester rifle upstairs as well as a box of ammunition, but that was "hard to explain. It's—it was more or less like a comfort."

When defendant saw the brown car leave the Boske residence and come towards his driveway, he went inside the house and snuck into the upstairs bedroom to position the rifle next to the window. It was already loaded. Defendant observed two identical cars approach his gate, and even though he had "a pretty good inclination that the police were gonna show up sooner or later," he "expected" that his wife and her boyfriend were in the vehicles now approaching.[6] The driver of the lead car exited the vehicle. Defendant could not see the people inside the vehicles, only silhouettes. Defendant said he tried to open the window and could not do so, so he grabbed the rifle and knocked out a pane of glass with the barrel. Then he placed the rifle up to his shoulder, set his finger on the trigger, and twice "shot towards the passenger door" of the lead vehicle, which was where he thought his wife was.[7] He did not use the bullhorn, nor did he pick up the binoculars to see who was there, nor did he fire a warning shot, and he "can't really say whether [he] wanted to kill [his] wife or not." Observing that the driver "had got to cover," defendant fired twice at the door on the driver's side.[8] Switching back to the other side of the lead vehicle, defendant noticed out of the corner of his eye the bedroom window breaking. Pieces of glass went flying, and he got hit in the head. He claimed his gun discharged as he fell backwards. When he got

---

[6] Defendant admitted, though, that he had seen Julie's suspected boyfriend driving a gray van and a white van, but never driving cars like these.

[7] Defendant had been an expert shooter in the Army as a helicopter door gunner and continued to hone his skills through target practice near the house. Target practice included shooting at head-size silhouettes about 35 feet away and shooting at beer cans about 60 yards away. He had used the .30-.30 rifle with the sling in target practice, but claimed he had never before shot the rifle he used to kill Griffith.

[8] Defendant claimed that he did not aim at the driver; "If I wanted to kill that man, he would never have got back to cover." Defendant claimed he intended "more or less to suppress fire," although he also said he had not seen that the driver had any weapon.

back up, blood fell on his hand, his head was ringing, and he felt as though he had been hit in the head with a baseball bat. Defendant also testified that he never aimed at any individual person, never shot at the second vehicle, and never intended to hit anyone, although he knew that a high-powered weapon could shoot through the metal of a car. He did not know why he continued to fire after his first shot, although he testified that he would have *kept* firing if a bullet had not grazed his head. He "just wanted them to leave [him] alone."

Nonetheless, defendant went downstairs and loaded all his weapons "to the max." He thought he would shoot at anyone's feet that were visible underneath the door of either vehicle; then, when the person or persons fell, he planned to "finish it off." But defendant could no longer see anyone from upstairs, so he planned to escape by rappelling off the west side of the house and then ambushing the cars from behind. As defendant went to retrieve some more ammunition, though, he noticed "this guy's legs sticking out" on the ground. They were not moving. Defendant went back downstairs to get to the phone, "and somewhere between the time I looked out that window, and I finally got somebody on the phone, I realized it was a Sheriff." Defendant then reported, "I shot the Sheriff."

Defendant claimed he told the officer on the phone "that they could get the deputies out of there." He also agreed to allow the dump truck to rescue them. Defendant claimed that he did not see any emblems on the patrol vehicles, did not recognize the uniforms, and thought the light bars were ski racks. "I don't know whether it was when I was just standing there staring at this man waiting for him to move or what, when I realized who he was." He claimed he had never seen a Lassen County Sheriff's Department vehicle before.[9]

Defendant admitted placing a gas can in front of each vehicle that was close to a building because he did not expect to get out of there and did not want to leave anything standing for his wife. Three of the cans were full of gasoline; the rest contained a couple of gallons each. Defendant planned to shoot the full cans with a rifle, let them drain halfway, and then fire a .357 Magnum hollow-point bullet filled with gunpowder at the flammable liquid. He could see each of the gasoline cans from the upstairs bedroom window, and he also had placed a can inside the house. The thought of committing

---

[9] The defense also called James Hooper, a California Highway Patrol officer, who testified that he had had trouble seeing the sheriff's vehicles as he initially drove down the Ervines' driveway because they blended into the sagebrush and background. However, Hooper also testified that he had snow and "stuff" all over his windshield and that he was able to recognize them clearly as being Lassen County Sheriff's Department vehicles as he proceeded farther down the driveway but was still a few hundred yards away.

suicide "crossed [his] mind" when he called the police, and he also wrote out a will. He ultimately agreed to surrender himself. Defendant paused and said a prayer for Griffith as he passed by the body. He felt remorse and wished he could have traded places with Griffith. He could not believe the other officers "left him layin' there" prior to his surrender.

Special Agent Albert Fox of the Department of Justice testified in rebuttal that defendant, during a taped interview the day after the shooting, had said he barricaded the windows " 'cuz I wasn't gonna go to jail, man, you know." During the interview, defendant also said he knew without a doubt that the driver who exited the lead vehicle was from the sheriff's department. Defendant, in surrebuttal, claimed his statements during the interview concerning his awareness that the driver was a deputy sheriff were based on what he had figured out *after* the shooting.

*Penalty Phase Evidence*

Julie Ervine recounted the events that led her to flee her home through the bathroom window. Defendant was sitting on the couch, cleaning a rifle, when she arrived home around 9:00 p.m. on March 1, 1995. Defendant "looked different," but it was hard to explain how, and seemed upset about a lot of things. They discussed his wanting to have a haircut and wanting to repair the wiper on her rear windshield right then, but Julie thought that both of those tasks could wait until the next day. After she had changed into her bathrobe, he grabbed her, threw her down on the bed, pinned her arms and legs, and shoved a gun into her cheek. He said, "I should shoot you," and added that he wanted to kill her. Then he said, "No, I think that you—that you should suffer," and slid the gun off her face and fired it into the stuffed animal that was next to her.

Julie was afraid defendant was going to kill her and then himself, so she decided to escape and believed the only way out—since he was keeping an eye on the front door and the back door had been sealed shut—was through the bathroom window. She dove out the window in her robe and slippers and crawled to the Boske residence. The journey took her at least two hours and it was very cold. She reported the incident to the sheriff's department and then left the house with Boske, because they were afraid defendant would come over. She and Boske met Deputy Aldridge and Deputy Griffith at the post office and begged them not to go over to defendant's house, but Griffith responded that "that's his job, and that's what they're here for, and that it would be okay, and they would do everything they could to make sure that nothing happened."

Defendant had been a steelworker at the time Julie married him, five years earlier. Defendant then turned to buying and selling government surplus, but

he had to give that up for a time to take care of his father, who lived with them and needed round-the-clock care. Defendant received an inheritance of $20,000 to $30,000 after his father died in 1992. Julie had hoped that the move from Sacramento to Ravendale would be helpful to defendant, who was having trouble getting along with people and did not seem to want to work anymore.

The People also presented evidence of the crime's impact on Deputy Griffith's family and coworkers.

Deputy Larry Griffith's wife, Laurie Griffith, testified that she had been uncomfortable when her husband received the call about the domestic violence incident from dispatch around 4:30 a.m. A few hours later, Kay Dieter from the probation department came to the Lassen County Federal Credit Union, where Laurie worked, to say "they had a situation, and they needed [her] to go down to the Department." Her heart sank: "It was kind of one of those feelings that you always dread." She and Karen Freitas were taken to the sheriff's department and told that there was a deputy "down"— but not which one. Around 12:30 p.m., she found out it was her husband. Her 14-year-old daughter Crystal was there when she learned the awful news. Larry's son David is a deputy sheriff in Florida and has two children, including one that Larry never got to see.

Lassen County Sheriff Ronald D. Jarrell hired Larry Griffith in 1984 and described the sheriff's department as a close-knit group. There was grief and pain everywhere after this incident, and Jarrell brought in two professional counselors for the staff and their families. Jarrell felt helpless upon learning that Griffith had been shot but he also needed to ensure that the remaining officers were safely removed from the situation. It was difficult to deal with his anger and continue to perform his duties as a professional peace officer, and it bothers him still that they were not able to retrieve Griffith's body at the time they rescued the surviving officers. The murder caused some experienced officers to question their own abilities and bred a lack of self-confidence among the more junior officers. In particular, Deputy Aldridge told Jarrell a few days later that he wanted to see his children grow up and decided to quit. The dispatcher still has difficulty dealing with the fact that she sent Griffith to respond to this call. Even at the time of trial, deputies were more likely to request assistance in responding to a domestic violence call, and deputies in the field would respond even out of their areas to such requests.

The defense called a total of 22 witnesses—family members, friends, neighbors, and coworkers—to attest to defendant's character. Defendant had served in the Army in Vietnam and had received a medal for bravery. After he

came home, he was in charge of the honor guard at the Presidio in San Francisco and traveled all over the western United States to attend military funerals.

Several of defendant's family members, friends, and coworkers testified that defendant was a hard worker and well liked by his bosses. His niece and nephew testified that he was always there to listen and to help settle differences among the family members. Defendant had helped out by watching his friend Danny Joe "Jake" Jacobsen's sons when he lived at the Jacobsen house between jobs and was considered "family." Peggy Van Ness, too, considered defendant to be "family," and he had dated her sister Denise off and on for seven years. William Enbysk had sent his youngest son to live with defendant for a time, when the boy was struggling through an awkward age; Enbysk said defendant was like "a brother." Robert Harter testified that defendant was his best friend and mentor and also was considered to be part of the family.

Defendant's neighbors in Sacramento testified that he was a very good neighbor and had been helpful on numerous occasions, including repairing (and then replacing) May Belle Oliver's wheelchair and giving her a wheelchair ramp for her house. Bernadette Tuton, another neighbor (and a single parent), said defendant had helped her many times. Tuton also admitted expressing concern to Julie Ervine about her safety if she moved to Ravendale with defendant.

The defense presented evidence of two awards defendant had received for bravery during combat in Vietnam in 1969. The People presented evidence of a reprimand defendant received from the Army in 1975 that involved punching a military police officer, as well as a letter of discharge that same year due to defendant's "poor attitude and lack of self-discipline."

## II. Pretrial Issues

A. *The Intrusion into Privileged and Confidential Defense Strategy Documents by the Sacramento County Sheriff's Department*

On January 25, 1996, during jury selection, defense counsel reported to the court that Sacramento County jail personnel had entered defendant's cell while he was in court two days earlier and "read all of his notes which I asked him to prepare for this case which he has in his legal file." The prosecutor, Chief Assistant Attorney General George Williamson, responded that neither he nor Ridgely Lazard, the Lassen County District Attorney, was aware of this cell search and that they never received any information from it.

Six days later, defendant filed a motion to dismiss the indictment, alleging a violation of his right to counsel under the state and federal Constitutions

and violation of various state statutes. The motion was supported by declarations from defense counsel and defendant himself, which asserted that counsel had provided defendant with copies of police reports, investigative reports, transcripts of his tape-recorded statements, and other discovery; that defendant had reviewed those materials and had made notes on them to assist in his defense; that defendant provided counsel with copies of these notes; that counsel had initiated investigations based on those notes and commentary; and that members of the Sacramento County Sheriff's Department had apparently read these defense materials during a cell search.

The defense called two witnesses to testify at the hearing on the motion to dismiss: defendant himself and Willy Percy, an inmate in the adjacent jail cell. Percy testified that he had observed jail officers enter defendant's cell and remain for "a good half an hour or more." Percy then announced that he did not wish to testify "as far as anything that [he] may have saw or didn't see"; that he had been told by a member of the sheriff's department "to stay out of this"; that he had been strip-searched and his own cell had been searched "since this has come about"; and that he was afraid of what would happen in his own criminal case as a result of testifying. Defendant testified that when he returned to his cell that day, he noticed that the cell had been searched, but not in a "normal" way. According to defendant, a normal cell search involves stripping the bedcovers from the mattress and removing contraband Styrofoam cups and extra clothing from the cell, but this time the covers were still on the mattress, his extra sock was still hanging on the sink, and the extra Styrofoam cups had not been removed. The only items that seemed to have been disturbed were those on the table, including his legal folders, which were jumbled. The papers in the folders had been turned sideways or backwards, and some pages were bent.

The trial court made a factual finding that Sacramento County jail personnel had read defendant's privileged legal materials. But, in the absence of any evidence that jail personnel had communicated the confidential defense information to the Lassen County prosecution team, the trial court determined that defendant had failed to make out a prima facie violation of his Sixth Amendment right to counsel and denied the motion to dismiss. Chief Assistant Attorney General George Williamson reiterated that he and District Attorney Lazard were willing to take the stand and be asked if they had directed, authorized, or received any information from the search of defendant's cell—although, he added, "I don't think that we'll be able to help him"—but defendant did not accept the invitation.

Defendant renews his constitutional and statutory claims here. Although we certainly do not condone the intrusion on defendant's privileged materials by members of the Sacramento County Sheriff's Department, we agree with the trial court that the record does not establish reversible error.

We begin our analysis of defendant's Sixth Amendment claim with *Weatherford v. Bursey* (1977) 429 U.S. 545 [51 L.Ed.2d 30, 97 S.Ct. 837] (*Weatherford*). Weatherford was an undercover agent for the South Carolina State Law Enforcement Division who, along with Bursey and two other individuals, vandalized a local office of the Selective Service. In order to maintain Weatherford's undercover status, Weatherford was arrested and charged along with Bursey. Prior to trial, Weatherford was invited to meet with Bursey and his attorney on two occasions to discuss " 'information, ideas or suggestions as to [Bursey]'s defense.' " (*Id.* at p. 548.) At no time did Weatherford discuss or pass on to his superiors or to the prosecuting attorney any details or information he had obtained from those meetings. Weatherford did, however, testify at Bursey's trial as to his undercover activities and his eyewitness account of the vandalism. After Bursey was convicted, he initiated a civil rights action under 42 United States Code section 1983, alleging that Weatherford had communicated confidential defense information to his superiors and prosecuting officials, thereby depriving Bursey of his Sixth Amendment right to the assistance of counsel. (*Weatherford, supra*, 429 U.S. at pp. 548–549.)

The high court rejected, at the outset, the contention that "whenever conversations with counsel are overheard the Sixth Amendment is violated and a new trial must be had." (*Weatherford, supra*, 429 U.S. at p. 551.) Rather, "the constitutionality of the conviction depends on whether the overheard conversations have produced, directly or indirectly, any of the evidence offered at trial." (*Id.* at p. 552.) Given the district court's finding that the undercover agent had communicated nothing at all about the two defense meetings to anyone, there was no "realistic possibility of injury to Bursey or benefit to the State." (*Id.* at p. 558.) Accordingly, "[a]s long as the information possessed by Weatherford remained uncommunicated, he posed no substantial threat to Bursey's Sixth Amendment rights." (*Id.* at p. 556.)

Defendant concedes that the trial court here, like the district court in *Weatherford*, made an explicit finding that no privileged information had been communicated to the prosecution team. He attempts to distinguish *Weatherford* on the ground that the trial court's finding here was not supported by any direct evidence. Defendant is correct that the People made only an offer of proof that the prosecution team neither instigated nor benefited from the improper conduct of the Sacramento County Sheriff's Department and never actually called any witnesses to the stand to establish that fact. Yet it is also true, as the Attorney General points out, that the record is devoid of any indication that the sheriff's department communicated any confidential information to anyone.

The question, then, becomes which party bears the burden of proof concerning the communication of privileged information to the prosecution

team. Is the burden on defendant to establish that the prosecution or its witnesses obtained confidential information? Or is the burden on the People to establish that no confidential information was communicated to the People or its witnesses? Once again, we find *Weatherford* instructive. In response to Justice Marshall's dissent, which complained about the difficulties of "[p]roving that an informer reported to the prosecution on defense strategy" (*Weatherford, supra,* 429 U.S. at p. 565 (dis. opn. of Marshall, J.)), the *Weatherford* majority rejected the contention that "federal or state prosecutors will be so prone to lie or the difficulties of proof will be so great that we must always *assume* . . . that an informant communicates what he learns from an encounter with the defendant and his counsel . . . ." (*Id.* at pp. 556–557, italics added.)

Defendant nonetheless insists that where any government agency intrudes on a criminal defendant's attorney-client relationship, a prima facie violation of the Sixth Amendment has been established. In his view, there can and should be a presumption that the offending agency has shared confidential information with the prosecuting entity, and points out that the high court has not explicitly resolved "the issue of who bears the burden of persuasion for establishing prejudice or lack thereof when the Sixth Amendment violation involves the transmission of confidential defense strategy information." (*Cutillo v. Cinelli* (1988) 485 U.S. 1037 [99 L.Ed.2d 915, 108 S.Ct. 1600] (dis. opn. of White, J., from the denial of cert.).) Some federal circuit courts place the burden on the defendant to establish prejudice. (*Clark v. Wood* (8th Cir. 1987) 823 F.2d 1241, 1249–1250; *U.S. v. Steele* (6th Cir. 1984) 727 F.2d 580, 586.) By contrast, some circuit courts find a per se violation of the Sixth Amendment once the defendant demonstrates that the prosecution has improperly obtained information concerning confidential defense strategy. (*Shillinger v. Haworth* (10th Cir. 1995) 70 F.3d 1132, 1141–1142; *U.S. v. Levy* (3d Cir. 1978) 577 F.2d 200, 209–210.) Taking an intermediate position are the circuit courts which hold that once the defendant has shown that confidential defense strategy was transmitted to the prosecution, the burden shifts to the prosecution to demonstrate there was no prejudice to the defendant from the disclosure. (*U.S. v. Mastroianni* (1st Cir. 1984) 749 F.2d 900, 907–908; accord, *U.S. v. Danielson* (9th Cir. 2003) 325 F.3d 1054, 1071–1074.)

Although these federal courts are divided as to whether the defendant or the prosecution has the burden of establishing prejudice arising from governmental intrusion on confidential attorney-client communications, there is *no* dispute as to the duty of the defense to establish, as part of its prima facie case, that confidential information was actually communicated to the prosecution team. Even those courts that find a per se constitutional violation when privileged information is communicated to the prosecution, and those courts that place the burden on the prosecution of rebutting prejudice in those

circumstances, presuppose that the defendant has first established that privileged information *was* communicated to the prosecution team. (*U.S. v. Danielson, supra,* 325 F.3d at p. 1074 [the defense established that the privileged information "was told to, and preserved by, members of the prosecution team" and "that the prosecutor in charge of the case kept much (perhaps all) of this information in his private office"]; *Shillinger v. Haworth, supra,* 70 F.3d at pp. 1134–1136 [the defense established that the prosecution learned about confidential attorney-client discussions from a deputy sheriff and used these confidences at trial]; *U.S. v. Mastroianni, supra,* 749 F.2d at pp. 907–908 ["the defendant must prove that confidential communications were conveyed as a result of the presence of a government informant at a defense meeting" before the burden shifts to the government to demonstrate the absence of prejudice]; *U.S. v. Levy, supra,* 577 F.2d at p. 209 ["We think that the inquiry into prejudice must stop at the point where attorney-client confidences are *actually disclosed to the government enforcement agencies responsible for investigating and prosecuting the case*" (italics added)]; see also *Briggs v. Goodwin* (D.C. Cir. 1983) 225 U.S. App.D.C. 320 [698 F.2d 486, 493, fn. 23] ["appellants have demonstrated that the informant may have passed information concerning their case to the prosecution"], vacated on other grounds (D.C. Cir. 1983) 712 F.2d 1444; *People v. Knippenberg* (1977) 66 Ill.2d 276, 279–282 [6 Ill.Dec. 46, 362 N.E.2d 681, 682–683] [the prosecution introduced at trial the defendant's statements to the defense investigator]; *Manley v. State* (1999) 115 Nev. 114, 119–120 [979 P.2d 703, 706] [the prosecution introduced at trial the defendant's statements to counsel]; *State v. Quattlebaum* (2000) 338 S.C. 441, 444–445 [527 S.E.2d 105, 107] [the investigator and the prosecuting attorney eavesdropped on confidential attorney-client conversations].)[10]

Defendant made no such showing here. The agency responsible for intruding on defendant's relationship with his attorney (the Sacramento County Sheriff's Department) was completely unrelated to the agency actually prosecuting defendant (the Lassen County District Attorney's Office). Indeed, defendant makes no allegation that the Sacramento County Sheriff's Department was any part of the prosecution team in this case, nor does he cite even a single authority for his contention that *any* government agency that intrudes improperly on attorney-client communications automatically

---

[10] Defendant also asserts that reversal is required even if there is only a "substantial threat" that the prosecution obtained information from the Sacramento County Sheriff's Department, and invokes *United States v. Morrison* (1981) 449 U.S. 361 [66 L.Ed.2d 564, 101 S.Ct. 665] as authority for this relaxed standard. He has misread *Morrison,* which *assumed* that the Sixth Amendment had been violated (*Morrison, supra,* at p. 364) and referred to "demonstrable prejudice, or substantial threat thereof" only insofar as those standards might justify the remedy of dismissing the indictment (*Morrison, supra,* at p. 365). *Morrison* did not address the standard for ascertaining the *existence* of a Sixth Amendment violation, which is the question presented here.

should be presumed to have communicated confidential information to the agency or agencies that are actually involved in the prosecution. (Cf. *In re Pratt* (1980) 112 Cal.App.3d 795, 857 [170 Cal.Rptr. 80] ["there is no showing whatsoever, short of sheer speculation and conjecture on the part of defense counsel, that the prosecuting attorney in the instant case either was aware of the FBI informants in defense camp or received or used any of the knowledge obtained by FBI Cointelpro informants concerning defense tactics or strategy . . ." (capitalization omitted)].)

■ We have already recognized that " 'information possessed by an agency that has no connection to the investigation or prosecution of the criminal charge against the defendant is not possessed by the prosecution team' " with respect to the prosecution's duty to disclose exculpatory information under the federal Constitution and state discovery rules. (*In re Steele* (2004) 32 Cal.4th 682, 697 [10 Cal.Rptr.3d 536, 85 P.3d 444].) Similarly, we find that misconduct by a government agent who has no involvement in the investigation or prosecution of the criminal charge against the defendant cannot automatically be imputed to the prosecution team for purposes of the Sixth Amendment. (Cf. *Steele, supra,* at p. 701 ["Prison officials did not investigate or help prosecute any of these crimes. Thus, the prosecution was generally not responsible for information prison officials possessed that might help the defense."].) Whatever civil remedy defendant may have had against the culpable members of the Sacramento County Sheriff's Department, it seems plain that, in the absence of evidence that confidential information was actually conveyed to the prosecution team, defendant has no claim that his Sixth Amendment rights were violated. (*People v. Jenkins* (2000) 22 Cal.4th 900, 1001–1003 [95 Cal.Rptr.2d 377, 997 P.2d 1044] [court-ordered searches of the defendant's cell, including his legal materials, did not violate the Sixth Amendment where no material observed by sheriff's deputies was introduced at trial or used by the prosecution against the defendant]; *People v. Hardy* (1992) 2 Cal.4th 86, 181 [5 Cal.Rptr.2d 796, 825 P.2d 781] [the defense allegation that some legal papers were viewed by jail officials during a lockdown and search did not establish a Sixth Amendment violation where "there was no evidence the search was instigated by the prosecutor, or otherwise designed to enhance the prosecution's case"]; see generally *Jenkins, supra,* 22 Cal.4th at p. 1002 ["conditions of confinement that have not actually affected the defendant adversely are not grounds for reversal of a conviction . . ."].)[11]

---

[11] For similar reasons, we reject defendant's claim that, under *People v. Zapien* (1993) 4 Cal.4th 929 [17 Cal.Rptr.2d 122, 846 P.2d 704], the People bore the burden to disprove prejudice arising from the intrusion on the attorney-client relationship by the Sacramento County Sheriff's Department. As we recently explained, *Zapien* declared that "in order to avoid dismissal of a criminal action because of *prosecutorial destruction* of evidence, the People must prove facts, by a preponderance of the evidence, establishing that the destruction of the

■ Defendant also asserts that "[a]n inevitable consequence" of the intrusion by the sheriff's department was an "enduring fear" concerning the privacy of his communications with counsel, which impaired his federal right to the effective assistance of counsel. Under our case law, however, a defendant's inability to consult with counsel or to assist in his defense must appear in the record. (*People v. Jenkins, supra,* 22 Cal.4th at pp. 1002–1005.) Here, defendant not only fails to identify any instance in which his relationship with counsel was impaired (or, indeed, to claim that more direct methods of communicating with his attorney were inadequate), but he was offered the opportunity, at the time the trial court denied his motion to dismiss, to renew his claim of error and submit additional evidence, but never did so. (*People v. Cantrell* (1992) 7 Cal.App.4th 523, 551 [9 Cal.Rptr.2d 188].) Because his claim still is not supported by any reference to the record, we must reject it. (*People v. Jenkins, supra,* 22 Cal.4th at p. 1005.)

Defendant fares no better with his claim that his right to counsel under article I, section 15 of the California Constitution was violated. He relies principally on *Barber v. Municipal Court* (1979) 24 Cal.3d 742 [157 Cal.Rptr. 658, 598 P.2d 818] (*Barber*), which considered the proper pretrial remedy when an accused's right to counsel was denied by the actions of an undercover police officer who posed as a codefendant, attended the attorney-client conferences of the accused, and communicated privileged information to his superiors. (*Id.* at pp. 745, 749.) *Barber* declined to follow *Weatherford,* noting that "the right to privacy of communication between an accused and his attorney has consistently been grounded on California law" (*Barber, supra,* 24 Cal.3d at p. 755) and that "the issue of *remedy* for a violation of the right to counsel in a criminal case was not before the court in *Weatherford*" since "the court found there had been no violation of the federal Constitution at all." (*Id.* at p. 758, fn. 19.)

---

evidence did not prejudice the defendant." (*People v. Posey* (2004) 32 Cal.4th 193, 212 [8 Cal.Rptr.3d 551, 82 P.3d 755], italics added.) In *Zapien,* one of the prosecutors had directed the chief investigator to listen to a cassette tape found in a sealed envelope bearing the name of the defense attorney and report what was on the tape; the chief investigator instead disposed of the tape without listening to it. (*Zapien, supra,* 4 Cal.4th at p. 961.) There was no evidence in the record that the investigator had listened to the tape and, hence, no evidence of an invasion of the attorney-client relationship. (*Id.* at pp. 963–966.) We therefore had no occasion to consider in that case who would bear the burden of proving or disproving prejudice and how that burden might be satisfied where a defendant claimed a violation of the right to counsel due to an invasion of the attorney-client relationship. Moreover, here, unlike in *Zapien,* defendant submitted no evidence that anyone involved with either the investigation or prosecution of his case participated in or was even aware of the misconduct by the Sacramento County Sheriff's Department. (See *Weatherford, supra,* 429 U.S. at p. 558 [unless the substance of attorney-client conversations was communicated to the prosecution "and thereby created at least a realistic possibility of injury to [the defendant] or benefit to the State, there can be no Sixth Amendment violation"].)

*Barber* determined that a pretrial remedy barring the prosecution from relying on any evidence obtained by the undercover officer or the fruits thereof would be inadequate under the facts presented, for several reasons. First, the record demonstrated that the petitioners had been prejudiced in their ability to prepare their defense in that they had become "[d]istrustful of each other and fear[ful] that any one of them might also be an undercover police officer" and thus refused to participate or cooperate in their defense, which "resulted in counsel's inability to prepare adequately for trial." (*Barber, supra,* 24 Cal.3d at p. 756.) Second, we were concerned that it would be easy for the undercover officer, as a prosecution witness, to formulate answers and shade testimony with knowledge of the confidential attorney-client communications, but difficult for a defendant to prove the influence of those confidential communications on the witness's testimony. (*Id.* at p. 757.) Third, we noted that the accused would be placed "in a Catch-22 situation" because the full contents of the privileged conversations would need to be disclosed in order for the court to understand what needed to be protected. (*Id.* at p. 758.)

■ The circumstances of this case are distinguishable from those in *Barber.* As stated above, the record contains no evidence that defendant was prejudiced in the preparation of his defense. In addition, no one in the Sacramento County Sheriff's Department was involved in the investigation or prosecution of this case or even testified at defendant's trial. And the trial court could readily have determined what confidences were compromised (because defendant and his attorney had copies of what documents jail personnel had reviewed) and whether disclosure of these confidences could have disadvantaged the defense, but defendant never presented the documents to the trial court for its review or made them part of the record on appeal. (*People v. Towler* (1982) 31 Cal.3d 105, 122 [181 Cal.Rptr. 391, 641 P.2d 1253] (*Towler*).) Defendant is correct that the record does not reveal "whether the prosecution team—and its witnesses—received information which derived from the government's intrusion into the confidential heart of his defense," but it was defendant who failed to make that record in the first instance. (See *People v. Benally* (1989) 208 Cal.App.3d 900, 909 [256 Cal.Rptr. 483].)

In that respect, *Towler,* not *Barber,* is the closer analogue. In *Towler,* the district attorney entered the defendant's cell and read a synopsis of the defense prepared by the defendant at counsel's request. The confidential document was never introduced into evidence or made part of the record on appeal, and the defendant never made a motion to suppress the document or to dismiss the case. (*Towler, supra,* 31 Cal.3d at p. 121.) We found the record "totally inadequate to determine whether or not dismissal would be an appropriate sanction," inasmuch as "it might have been readily apparent from an examination of the document whether or not the prosecution was actually aided by the information and whether some remedy short of dismissal would be adequate to protect defendant's rights." (*Id.* at p. 122; see also *People v.*

*Fulton* (1984) 155 Cal.App.3d 91, 100 [201 Cal.Rptr. 879] [quoting *Towler*].) Similarly, here, even if confidential information contained in defendant's notes had been shared with the prosecution, the record here (which likewise does not contain a copy of the documents reviewed by the sheriff's department) is insufficient to demonstrate that defendant was actually prejudiced. (*Towler, supra,* 31 Cal.3d at pp. 122–123.)

Having already rejected defendant's claims that his federal and state constitutional rights to counsel were violated, we have no difficulty rejecting defendant's claim that the sheriff's department's misconduct deprived him of his right to due process. If, as discussed above, there is no evidence that the cell search had any effect on this trial, it follows that the search could not have undermined the fundamental fairness of the trial. (*People v. Jenkins, supra,* 22 Cal.4th at pp. 999, 1002–1003 [rejecting due process claim based on "allegedly disruptive searches of [the defendant's] cell and legal materials"].)

Finally, we reject defendant's claim that his conviction must be reversed because of asserted violations of state statutes that protect the right to communicate confidentially with his attorney, such as Evidence Code sections 952 and 954, Code of Civil Procedure sections 2018.020 and 2018.030, and Penal Code section 2601, subdivision (b). Even assuming that one or more of these provisions was violated, defendant still has the burden to show a miscarriage of justice. (Cal. Const., art. VI, § 13.) He has made no effort to do so, and the foregoing discussion shows that he cannot.

### B. *Shackling of Defendant During a Portion of Voir Dire*

There is no dispute that defendant was shackled unjustifiably during a portion of the voir dire. Defendant contends that the error violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution and article I, sections 7, 15, 16, and 17 of the state Constitution and requires reversal of the judgment.[12] In our view, the record fails to

---

[12] As to this and nearly every claim on appeal, defendant asserts the alleged error violated his constitutional rights. At trial, he failed to raise some or all of the constitutional arguments he now advances. We nonetheless address the merits of these contentions: "In each instance, unless otherwise indicated, it appears that either (1) the appellate claim is of a kind (e.g., failure to instruct sua sponte; erroneous instruction affecting defendant's substantial rights) that required no trial court action by the defendant to preserve it, or (2) the new arguments do not invoke facts or legal standards different from those the trial court itself was asked to apply, but merely assert that the trial court's act or omission, insofar as wrong for the reasons actually presented to that court, had the additional *legal consequence* of violating the Constitution. To that extent, defendant's new constitutional arguments are not forfeited on appeal. [Citations.] [¶] In the latter instance, of course, rejection, on the merits, of a claim that the trial court erred on the issue actually before that court necessarily leads to rejection of the newly applied

demonstrate the restraints were visible to the jury and, even if they were, any error in shackling defendant during a portion of the voir dire was harmless beyond a reasonable doubt.

At a pretrial hearing on January 16, 1996, the trial court recounted the discussion that had occurred in chambers concerning "the issue of restraints in this matter." The court stated that it "intends to defer to the Sheriff" and that the assigned deputy had indicated "that no restraints will ever be shown or disclosed to the jury, the jury will never see that." The court added that if a belly chain were used during the trial, "we will dispense with the normal opening so that [defendant] is not in any way embarrassed, or shown not to show respect to the Court." Defense counsel requested that defendant not be in restraints "during the course of the trial" because counsel feared that, no matter what efforts were made to conceal the restraints from the jury, "eventually in a case that is going to take a little while, the jury is going to recognize the fact that he's in restraints," and because defendant had no criminal history that would justify restraints. The court addressed only the first of these objections: "If the Court felt in any way the jury would become aware of his restraints, I would be very concerned . . . ; but I am satisfied they will not be. [¶] I have tried zillions of cases with and without restraints, and I never had an instance in which the jury indicated that they were aware of the use of the type of restraints that we use here." The minute order from that date stated, "The defendant will be seated in a security chair with no restraints visible to the jury."

For the first two days of jury selection, the record does not indicate what restraints, if any, were used in court. On the third morning, the court acknowledged that it had "certainly" erred in deferring to the sheriff's department on the issue of restraints, but stated that "[o]f course we haven't had the use of restraints yet in front of this jury at all, so I suppose that the problem is inapposite up to now." When the bailiff corrected the court and advised that defendant was using a belly chain "right now," the court declared a need for a hearing, at which it would make factual determinations concerning the need for restraints, and proposed to hold the hearing later that morning, since the restraint "is still invisible." Defense counsel objected to the latter characterization, complaining that "it's not. You can see it, but you have to look. It's not covered," but the court overruled the objection: "I never had a juror see a seat restraint in my experience in all these years."

constitutional 'gloss' as well. No separate constitutional discussion is required in such cases, and we therefore provide none." (*People v. Boyer* (2006) 38 Cal.4th 412, 441, fn. 17 [42 Cal.Rptr.3d 677, 133 P.3d 581]; see also *People v. Partida* (2005) 37 Cal.4th 428, 433–439 [35 Cal.Rptr.3d 644, 122 P.3d 765].)

After a morning of voir dire, the court announced that it had reviewed defendant's criminal history, which contained only some instances of resisting an officer in "the rather distant past" and two "relatively slight" jail disciplinary violations. The court accordingly found no basis to continue using the belly chain and ordered it removed.

■ "[A] defendant cannot be subjected to physical restraints of any kind in the courtroom while in the jury's presence, unless there is a showing of a manifest need for such restraints." (*People v. Duran* (1976) 16 Cal.3d 282, 290–291 [127 Cal.Rptr. 618, 545 P.2d 1322], fn. omitted.) "The imposition of physical restraints in the absence of a record showing of violence or a threat of violence or other nonconforming conduct will be deemed to constitute an abuse of discretion" under state law. (*Id.* at p. 291.) Under the federal Constitution, where a court ordered a defendant, without adequate justification, to wear restraints that were seen by the jury, the state must prove beyond a reasonable doubt that the unjustified shackling did not contribute to the verdict. (*Deck v. Missouri* (2005) 544 U.S. 622, 635 [161 L.Ed.2d 953, 125 S.Ct. 2007].) "The trial court may not delegate to law enforcement personnel the decision whether to shackle a defendant." (*People v. Seaton* (2001) 26 Cal.4th 598, 651 [110 Cal.Rptr.2d 441, 28 P.3d 175].)

The Attorney General concedes that the trial court erred in delegating to the sheriff's department the decision whether to shackle defendant and in allowing defendant to be shackled during a portion of voir dire without a showing of manifest necessity. He contends nonetheless that these errors were nonprejudicial, in that the record does not indicate that the restraint was visible to the prospective jurors or that the restraint impaired defendant's ability to assist in his defense. We agree.

Although defense counsel stated that "[y]ou can see" the restraint "but you have to look," he did not indicate that the restraint could be seen from the jury box. (See *People v. Strickland* (2006) 363 Ill.App.3d 598, 605 [300 Ill.Dec. 297, 843 N.E.2d 897, 903]; *Alexander v. State* (Miss. 2001) 759 So.2d 411, 418.) As defendant concedes, courts typically find unjustified shackling of a defendant to be harmless where the restraints were not visible to the jurors. (*People v. Cleveland* (2004) 32 Cal.4th 704, 740 [11 Cal.Rptr.3d 236, 86 P.3d 302] [" ' "We have consistently found any unjustified or unadmonished shackling harmless where there was no evidence it was seen by the jury." ' "]; *U.S. v. Mejia* (9th Cir. 2009) 559 F.3d 1113, 1117 [" 'When the jury never saw the defendant's shackles in the courtroom, we have held that the shackles did not prejudice the defendant's right to a fair trial.' "].) Defendant is correct that restraints also have the potential to impair an accused's ability to communicate with counsel or participate in the defense (*Deck v. Missouri, supra,* 544 U.S. at p. 631), but inasmuch as the record here

does not reveal that any such impairment occurred, the error once again was harmless (*People v. Wallace* (2008) 44 Cal.4th 1032, 1051 [81 Cal.Rptr.3d 651, 189 P.3d 911]; *People v. Combs* (2004) 34 Cal.4th 821, 839 [22 Cal.Rptr.3d 61, 101 P.3d 1007]; *U.S. v. Baker* (11th Cir. 2005) 432 F.3d 1189, 1246; *Castillo v. Stainer* (9th Cir. 1992) 983 F.2d 145, 149, as amended (9th Cir. 1993) 997 F.2d 669).

Even if the restraint had been glimpsed during that portion of voir dire by one or more of the prospective jurors who actually sat on the jury, the unjustified shackling was harmless beyond a reasonable doubt. (*People v. Cunningham* (2001) 25 Cal.4th 926, 988–989 [108 Cal.Rptr.2d 291, 25 P.3d 519]; *People v. Tuilaepa* (1992) 4 Cal.4th 569, 584–585 [15 Cal.Rptr.2d 382, 842 P.2d 1142]; accord, *State v. Speer* (2009) 221 Ariz. 449 [212 P.3d 787, 801] [no prejudice where juror saw the handcuffed defendant "brought into the courtroom in restraints during a preliminary proceeding"]; *Rhodes v. State* (1994) 264 Ga. 123 [441 S.E.2d 748, 749] [" '[t]he failure, through an oversight, to remove shackles from a prisoner for a short time after proceedings have commenced, or any technical violation of the rule prohibiting shackling, not prejudicial to him, is not ground for a new trial . . .' "]; *State v. Clark* (2001) 143 Wn.2d 731, 776 [24 P.3d 1006, 1029] ["[b]ecause the impact of shackling on the presumption of innocence is the overarching constitutional concern, it would logically follow that in the minds of the jurors Clark's shackling on the first day of voir dire was more than logically offset by over two weeks of observing Clark in the courtroom without shackles."].)

### III. Guilt Phase Issues

#### A. Alleged Error Relating to the Admission of Julie Ervine's Out-of-court Statements Concerning the Assault

As proof that the Lassen County officers were engaged in the lawful performance of their duties within the meaning of the special circumstance allegation (§ 190.2, subd. (a)(7)) and the crime of attempted murder of a peace officer (§ 664, subd. (e))—and, in particular, that the officers had probable cause to believe that defendant had committed a felony assault against his wife—Commander Freitas and Deputy Sheriffs Aldridge and Mahan testified as to what they were told by the Lassen County dispatcher and by defendant's wife, Julie Ervine. The trial court first explained to the jury the nonhearsay purpose of this evidence when Aldridge was about to testify as to what he had learned about the domestic violence incident from the dispatcher: "Your first lesson, in the hearsay rule, ladies and gentlemen, which I am sure you have heard of before. [¶] It simply means that, what someone testifies as to what another told him, is usually hearsay evidence,

right, because we can't cross-examine that other person. We don't know whether it's true. [¶] But it comes in not for whether or not what the person said is true, it comes to explain what the person who heard it did, okay. [¶] So he's going to explain what he did in response to what this person told him; but you do not-and so you receive it for that purpose only, to explain what the officer may have done in response to this information, but you don't take it as being for the truth of the matter stated by the person on the phone, okay. [¶] And now this would be double hearsay. The dispatcher doesn't know what happened. She heard it from somebody else, right. [¶] So you just have to keep in mind when you listen to this kind of testimony, that when it's hearsay testimony like that, it's not being offered to prove that those things are true."

When Aldridge moved on a few minutes later to describe what he had learned from Julie directly, defense counsel objected. The prosecutor explained that the evidence was offered "for a nonhearsay purpose, Your Honor, that goes to the special circumstance [of] performance of duties," and the court reminded the jury that "[i]t comes in for the same reasons, to explain what he did." At the conclusion of the trial, the jury was reminded that some evidence had been admitted subject to a limiting instruction.

Defendant contends that the admission of Julie's statements concerning the events that night were inadmissible hearsay and violated his state and federal constitutional right to confront the witnesses against him as well as state evidentiary rules. We find no error.

█ Defendant's statutory and constitutional arguments presuppose that the out-of-court statements introduced through the peace officers' testimony were inadmissible hearsay, but (as demonstrated above) the jury was instructed at length that these statements were not offered for their truth. Indeed, the jury was cautioned that defendant's wife and the dispatcher were not subject to cross-examination, that "we don't know whether [what they said was] true," that their statements were "not being offered to prove that those things are true," and that their statements instead were being admitted only "to explain what the officer may have done in response to this information" as part of the People's proof of "the special circumstance [of] performance of duties." (See *People v. Mayfield* (1997) 14 Cal.4th 668, 751 [60 Cal.Rptr.2d 1, 928 P.2d 485] [witness's out-of-court statement to officer that the defendant possessed a gun "was not admissible to prove that defendant in fact possessed a gun" but "was admissible for the nonhearsay purpose of establishing [the officer's] state of mind and the appropriateness of his ensuing conduct" to rebut a charge of excessive force].) Out-of-court statements that are not offered for their truth are not hearsay under California law (Evid. Code, § 1200, subd. (a); *Smith v. Whittier* (1892) 95 Cal. 279,

293–294 [30 P. 529]), nor do they run afoul of the confrontation clause. (See *Crawford v. Washington* (2004) 541 U.S. 36, 60, fn. 9 [158 L.Ed.2d 177, 124 S.Ct. 1354].)

■ Furthermore, we presume the jury faithfully followed the court's limiting instruction. (*People v. Mendoza* (2007) 42 Cal.4th 686, 699 [68 Cal.Rptr.3d 274, 171 P.3d 2].) Defendant points out, correctly, that limiting instructions have been deemed insufficient to protect a defendant from a nontestifying codefendant's confession implicating the defendant at a joint trial (*Bruton v. United States* (1968) 391 U.S. 123 [20 L.Ed.2d 476, 88 S.Ct. 1620]), but *Bruton* recognized only a "narrow exception" to the general rule that juries are presumed to follow limiting instructions (*People v. Lewis* (2008) 43 Cal.4th 415, 454 [75 Cal.Rptr.3d 588, 181 P.3d 947]), and defendant offers no rationale for extending the *Bruton* exception to this case.

Nor do we find that isolated (and largely unobjected-to) references in the prosecutor's opening statement or closing argument to what defendant "did" or "what occurred" when Julie was in the house undermined the court's limiting instruction. (See *People v. Carter* (2003) 30 Cal.4th 1166, 1209 & fn. 13 [135 Cal.Rptr.2d 553, 70 P.3d 981].) The prosecutor consistently referred to what the deputies had learned from the dispatcher or from defendant's wife and at no point sought to rely on the truth of those reports. Indeed, our review of the proceedings reveals that the prosecutor did no more than refer in a kind of shorthand to "Ravendale" as being the place "where Mr. Ervine lived, and where he did what he did"; to the deputies' obligation "to have contact with victims . . . to find out what occurred in order to figure out if they have to arrest somebody," since "what occurred was essentially a felony"; and to the deputies' conversation with Julie to find out "what happened." Based on those conversations, Commander Freitas testified that he "believed" Ms. Ervine was afraid of defendant, that he "had no reason to disbelieve Ms. Ervine," that he believed he had probable cause to arrest defendant, and that he intended to arrest defendant for assault with a deadly weapon—all of which were relevant to whether the officers had been lawfully performing their duties, regardless of whether Julie's statements were later proved to be true. And in closing argument, the prosecutor's reference to Julie's statements that defendant was angry and had a gun, regardless of the truth of those statements, explained why the officers approached the house without turning on their lights and sirens. (See generally *People v. Marsh* (1962) 58 Cal.2d 732, 738 [26 Cal.Rptr. 300, 376 P.2d 300] ["it has consistently and properly been held that the statements a police officer relies upon to make an arrest are admissible against hearsay objections, not to prove the truth of such statements, but to show the officer's state of mind (probable cause) in making the arrest"].)

Finally, we reject defendant's claim that the prejudicial effect of Julie's out-of-court statements outweighed their probative value (see Evid. Code, § 352)—an argument that defendant forfeited by failing to assert it below. (*People v. Wilson* (2008) 44 Cal.4th 758, 790, fn. 6 [80 Cal.Rptr.3d 211, 187 P.3d 1041]; *People v. Escobar* (2000) 82 Cal.App.4th 1085, 1103, fn. 11 [98 Cal.Rptr.2d 696] [hearsay objection did not preserve claim of undue prejudice].) Julie's out-of-court statements were essential to proving that the officers were performing their lawful duties when they approached defendant's home (see *U.S. v. Silva* (7th Cir. 2004) 380 F.3d 1018, 1020), and it was far less inflammatory to introduce those statements through the testimony of the peace officers than through the testimony of Julie herself. Inasmuch as defendant's plea of not guilty put at issue all of the elements of the charged crimes, the jury was instructed not to consider those statements for their truth, and defendant was not even charged with the assault against his wife, we perceive no risk of undue prejudice. Hence, the trial court did not abuse its discretion in allowing those officers to testify as to what they learned from defendant's wife about the felony assault. (*People v. Whisenhunt* (2008) 44 Cal.4th 174, 204–205 [79 Cal.Rptr.3d 125, 186 P.3d 496].)

### B. *Exclusion of Defendant's Postoffense Handwritten Statements*

Defendant complains next that the trial court excluded two documents—a handwritten will and five pages of notes defendant prepared in the hours after the shooting—as hearsay. We review the trial court's ruling for abuse of discretion (*People v. Poggi* (1988) 45 Cal.3d 306, 318–319 [246 Cal.Rptr. 886, 753 P.2d 1082]), and find no error.

A criminalist testified that he found a two-page handwritten document, defendant's exhibit H, in defendant's living room. When defendant took the stand, he testified that the thought of suicide "had crossed [his] mind" after the shooting and that exhibit H was the will he wrote during the hours he was trying to get the phone "hooked up" for negotiations with the law enforcement personnel outside the house. This document, entitled "The Last Will and Testament of Dennis Ervine," conveyed family mementos to his brother and personal possessions to a friend to repay a debt, extended a wish of peace to family and friends, and expressed a hope that "the world will learn something from this."

Defendant testified that he also wrote some other notes, which were marked collectively as defendant's exhibit I. In this five-page document, defendant apologized for "hurting innocent people"; described his wife's drug problem, theft, and infidelity, and forgave her; claimed he had been "driven to the edge of no return" and was wracked with passion and turmoil; asked for God's forgiveness and for God to help the fallen officer; begged to be sent to

"a life of eternal damnation" if the officer was dead; wondered whether he should be a coward and let others kill him; stated that he could not kill his wife because he loved her; and advised his nephews to straighten out their lives.

Defendant sought to admit these exhibits into evidence as exceptions to the hearsay rule (see Evid. Code, §§ 1240 [spontaneous statement], 1250 [statement of declarant's then existing mental or physical state]) or as nonhearsay evidence of his state of mind. The trial court, after having read both exhibits, denied the motion, finding that the writings were "neither spontaneous or contemporaneous" and were hearsay not within any exception.

On appeal, defendant has abandoned his argument that the written statements qualified as spontaneous declarations. He argues instead that the written statements tend to prove his state of mind either as an exception to the hearsay rule or as nonhearsay. He also argues, for the first time, that certain statements were admissible as prior consistent statements (see Evid. Code, §§ 791, 1236) and that exclusion of these exhibits violated his constitutional right to present a defense. We examine these arguments in order.

■ Evidence Code section 1250 allows into evidence a statement of the declarant's then existing state of mind, notwithstanding the hearsay rule, when the statement is offered to prove the declarant's state of mind "at that time or at any other time when it is itself an issue in the action." (*Id.,* subd. (a)(1).) The five-page note (exhibit I) contains a number of hearsay representations as to defendant's state of mind, including that he felt "driven to the edge of no return"; that there was "anger" and "turmoil" inside him; that he had fired no gun "in anger, just one in passion, missed because of love"; that he was "sorry" for hurting innocent people and "[h]ope[d]" the officer would recover; and that he felt "alone, cut off by the world, that what I wished for so long." (See *People v. Jurado* (2006) 38 Cal.4th 72, 129 [41 Cal.Rptr.3d 319, 131 P.3d 400] ["assertions and descriptions of [the defendant's] own feelings and other mental states . . . were hearsay"].) However, this exception to the hearsay rule is inapplicable "if the statement was made under circumstances such as to indicate its lack of trustworthiness." (Evid. Code, § 1252.)

" 'The decision whether trustworthiness is present requires the court to apply to the peculiar facts of the individual case a broad and deep acquaintance with the ways human beings actually conduct themselves in the circumstances material under the exception. Such an endeavor allows, in fact demands, the exercise of discretion.' " (*People v. Edwards* (1991) 54 Cal.3d 787, 819–820 [1 Cal.Rptr.2d 696, 819 P.2d 436].) "To be admissible under Evidence Code section 1252, statements must be made in a natural manner,

and not under circumstances of suspicion, so that they carry the probablility of trustworthiness. Such declarations are admissible only when they are ' "made at a time when there was no motive to deceive." ' " (*Id.* at p. 820.)

We find the trial court did not abuse its discretion. At the time defendant wrote these documents, he was trapped inside his house; personnel from the Lassen County Sheriff's Department and other law enforcement agencies were just outside. He was aware that his only options were surrender or suicide, and his statements focus largely on securing forgiveness. In addition, he had been grazed by a bullet himself, which is what caused him to stop shooting, not a sudden concern over the welfare of the officers outside, and he elected to write these notes while attempting to pursue negotiations with law enforcement. There was thus ample ground to suspect his motives and sincerity when he wrote these self-serving documents. (*People v. Edwards, supra,* 54 Cal.3d at p. 820.)[13]

Defendant then claims that "the relevance of a number of the statements in the notes and last will clearly does not depend on the truth of the matter asserted"—and thus the statements were not hearsay at all—but offers only a single example of such a statement: "Whether or not Ms. Ervine had been unfaithful or had spen[t] her husband's inheritance on drugs, [defendant]'s belief that she had done so was consistent with his trial testimony that his actions were not cold and deliberate, and were not made with an intent to kill the deputies." Yet defendant had already testified at trial, without contradiction, that he was upset with Julie for having spent his inheritance, for being unfaithful, and for having a collection of prescription drugs in her car. Accordingly, the jury was well acquainted with defendant's state of mind with respect to Julie's behavior. It simply did not believe that defendant's anger over Julie's conduct justified barricading himself inside his house, setting gas cans around and inside the house, and shooting at four uniformed members of the Lassen County Sheriff's Department who had arrived in their marked vehicles to arrest him for the act of violence against his wife the night before.

■ Defendant also contends the documents were admissible as prior consistent statements under Evidence Code sections 791 and 1236. The issue is not cognizable on appeal because defendant did not present that theory of admissibility at trial. (Evid. Code, § 354; *People v. Smith* (2003) 30 Cal.4th 581, 629–630 [134 Cal.Rptr.2d 1, 68 P.3d 302].) Even if the issue had been preserved, defendant has not clearly shown a basis on which to admit any of his prior written statements under this theory. "A prior statement consistent

---

[13] The documents would not have been admissible as evidence of defendant's previously existing mental state either, inasmuch as defendant was not unavailable as a witness. (Evid. Code, § 1251, subd. (a).)

with a witness's trial testimony is admissible only if either (1) a prior *in*consistent statement was admitted and the consistent statement predated the inconsistent statement, or (2) an express or implied charge is made that the testimony is recently fabricated or influenced by bias or other improper motive, and the consistent statement was made before the bias, motive for fabrication, or other improper motive is alleged to have arisen." (*Smith, supra,* at p. 630.) Although it is true that the written statements predated defendant's statements to Special Agent Fox that he had barricaded the windows because he "wasn't gonna go to jail" and had no doubt that the driver of the lead car was from the sheriff's department, defendant fails to explain how these particular oral statements are inconsistent with his earlier written statements, which nowhere deny the reason for the barricade or defendant's awareness of who was outside. Moreover, we emphatically reject defendant's argument that any prior written statements automatically became admissible merely because his " 'credibility in general' " was attacked during cross-examination.

■ As for defendant's federal claims, which were not asserted below and thus are barred to the extent they offer an independent basis for admission of these documents (see fn. 12, *ante*), it is enough to note that " '[t]he same lack of reliability that makes the statements excludable under state law makes them excludable under the federal Constitution.' " (*People v. Smith, supra,* 30 Cal.4th at p. 629; see also *People v. Jurado, supra,* 38 Cal.4th at p. 130.) Moreover, defendant presented all of this evidence—without contradiction—during his testimony at trial. In particular, the jury was aware that defendant contemplated suicide in the hours *following* the shooting, even going so far as to prepare a handwritten will, and that defendant felt remorse *after* the shooting and wished he could have traded places with the fallen officer. The jury nonetheless believed that even though defendant came to regret his actions, defendant did what he wanted to do *at the time of the shooting*. We find no error in the trial court's exclusion of the handwritten documents and certainly no prejudice under any standard.

C. *Failure to Instruct the Jury to View with Caution Out-of-court Admissions During the Taped Interrogation (CALJIC No. 2.71)*

In its rebuttal case, the People sought to impeach defendant's testimony through the introduction of admissions he had made while he was interrogated by Special Agent Albert Fox and Special Agent Ronald Eicher. The interrogation was tape-recorded, but neither the recording nor a transcript of the interrogation was introduced into evidence. Instead, Special Agent Fox recounted defendant's statements by testifying that defendant said he barricaded the house because he "wasn't going to go to jail, man" and admitted he knew the man outside the car was a deputy sheriff.

The jury was instructed with a portion of CALJIC No. 2.71 (Admission—Defined), as follows: "An admission is a statement made by the defendant other than at his trial which does not by itself acknowledge his guilt of the crimes for which such defendant is on trial, but which statement tends to prove his guilt when considered with the rest of the evidence. [¶] You are the exclusive judges as to whether the defendant made such an admission and, if so, whether such statement is true in whole or in part. If you should find the defendant did not make the statement, you must reject it. If you find that it is true in whole or in part, you may consider that part which you find to be true." However, the trial court declined to give the jury the final sentence of that instruction, which provides, "Evidence of an oral admission of [a] [the] defendant not made in court should be viewed with caution."

Defendant claims the omission of the final cautionary admonition was error and requires reversal of the judgment. (See *People v. Carpenter* (1997) 15 Cal.4th 312, 392 [63 Cal.Rptr.2d 1, 935 P.2d 708] ["When the evidence warrants, the court must give the cautionary instruction sua sponte."].) The People contend that the admonition was not required here because the admissions were tape-recorded (*People v. Mayfield, supra,* 14 Cal.4th at p. 776 ["this cautionary instruction is inapplicable, and should not be given, if the oral admission was tape-recorded . . ."]), even though the tape was never played for the jury. We need not decide whether the trial court had a duty to instruct the jury with the closing sentence under these peculiar circumstances because we find that any error was assuredly harmless. (See *People v. Heishman* (1988) 45 Cal.3d 147, 166 [246 Cal.Rptr. 673, 753 P.2d 629].)

The purpose of CALJIC No. 2.71 is to help the jury determine whether the admissions (in this case, defendant's statements to Special Agent Fox) were ever made. (*People v. Mungia* (2008) 44 Cal.4th 1101, 1134–1135 [81 Cal.Rptr.3d 614, 189 P.3d 880]; see also CALCRIM No. 358.) The portion of the instruction the jury did receive emphasized the jury's role as the exclusive judges of whether defendant made those statements and, if so, whether the statements were true.[14] Moreover, the defense never contested the accuracy of Fox's recollection, even during closing argument, and did not even bother to cross-examine him. Indeed, defendant *admitted* telling Fox that he knew that " '[t]he guy that stood up' " was " 'a Sheriff,' " but he tried to explain that this undisputed reference was to what he knew *after* the shooting had ended. Although defendant did testify prior to Fox's testimony that he did not know whether he made a statement about the barricade during the interrogation, the defense *still has never claimed* that Fox's account of what defendant said, which was fully consistent with the transcript of the taped interrogation, was

---

[14] Hence, we find unconvincing defendant's contention that "[a]ny attempt by defense counsel to argue that the statements should be viewed with caution would have been undercut by the trial court's failure to give the cautionary admonition."

inconsistent in any way with the taped interrogation itself. (Cf. Evid. Code, § 412.) Furthermore, there was considerable circumstantial evidence of defendant's intent in barricading the house and setting a boobytrap with the gas cans, independent of his admission to Fox. Accordingly, any error in omitting the additional cautionary admonition was harmless under any standard. (*People v. Mungia, supra,* 44 Cal.4th at p. 1135; *People v. Heishman, supra,* 45 Cal.3d at p. 166; see also *People v. Dickey* (2005) 35 Cal.4th 884, 905–906 [28 Cal.Rptr.3d 647, 111 P.3d 921].)

### D. *Exclusion of the Remainder of Defendant's Statements During the Taped Interrogation*

Prior to trial, defense counsel stated that he had intended to file a motion to suppress defendant's statements during the taped interrogation with Special Agent Fox but had been unable to find legal grounds to do so. Counsel did advise the court, however, that "if something should come up, I will be renewing that motion before any evidence in the statement comes before the Court."

The first time the taped interrogation was mentioned at trial was during defendant's cross-examination, when defendant admitted telling Fox he had fired the first shot. Defendant also claimed he did not remember whether he told Fox he had barricaded the house because he "wasn't going to go to jail, man." On redirect, defendant said he had expressed his wish, during the interrogation, to trade places with the fallen officer if he could. When defense counsel asked whether defendant had also said, "I don't have any excuse for shooting that Sheriff," the court sustained the prosecutor's hearsay objection. During a sidebar conference after the jury had been dismissed, defendant argued that once a portion of the interrogation had come in, then "the whole conversation" became admissible under Evidence Code section 356. The court disagreed and explained that only those interrogation statements related to those already elicited would be admissible. The trial court also rejected defendant's attempt to admit the statement as a spontaneous declaration or as evidence of his state of mind.

In rebuttal, the People called Special Agent Fox to testify as to two of defendant's statements: that defendant said he barricaded the house because he "wasn't gonna go to jail" and that he had no doubt the "guy that stood up" outside the car was from the sheriff's department. In surrebuttal, defendant testified that he realized only after the shooting that the "guy" was a peace officer. When defense counsel asked, "And at the time you gave the interview did you know that those two vehicles were Sheriff's vehicles?," the court sustained the prosecutor's objections to the question as outside the scope of the direct examination and calling for hearsay.

Defendant now contends that these statements from the interrogation—indeed, the "whole transcript of the interrogation"—were admissible under the rule of completeness (Evid. Code, § 356) and as prior consistent statements (Evid. Code, §§ 791, 1236), and that exclusion of the statements violated his constitutional right to present a defense. The People respond that defendant has preserved his claim only as to the two specific interrogation statements he sought to introduce at trial (i.e., that he did not "have any excuse for shooting that Sheriff" and that he did not know the two vehicles were sheriff's department vehicles); and that even as to those statements, defendant was barred from arguing that they were admissible as prior consistent statements or that their admissibility was compelled by his constitutional right to present a defense, inasmuch as defendant had failed to assert either basis during the trial. (Evid. Code, § 354.)

██ We begin by noting that here, as with some of his other claims, defendant forfeited his contention of constitutional error by failing to assert it below, except to the extent that the constitutional claim relies on the same facts and legal standards the trial court itself was asked to apply, and asserts merely that the trial court's act or omission, insofar as wrong for the reasons actually presented to that court, had the additional legal consequence of violating the Constitution. (See fn. 12, *ante*.) Defendant contends that he nonetheless preserved a broader constitutional argument by asking the court, prior to trial, to consider that "every motion that is being made in this court by the defense" is "in order to protect the defendant's Federal 4th, 5th, 6th, 8th, and 14th Amendment, constitutional rights, State Constitution, Article One, Sections One, Seven, 13, 15, 16, 17, and 27, constitutional rights, and all statutory rights he may have." Not so. We have long held that the proponent of evidence must identify the specific ground of admissibility at trial or forfeit that basis of admissibility on appeal. (*People v. Fauber* (1992) 2 Cal.4th 792, 854 [9 Cal.Rptr.2d 24, 831 P.2d 249]; see generally *People v. Partida, supra,* 37 Cal.4th at p. 435 ["A party cannot argue the court erred in failing to conduct an analysis it was not asked to conduct."].) This standard of specificity is not satisfied by offering a generic laundry list of potentially applicable constitutional provisions untethered to any particular piece of evidence.

However, even if we assumed that defendant had preserved all possible bases for admission and even if we were to view defendant's claims broadly enough to encompass the entirety of the taped interrogation, we would conclude that defendant was not prejudiced. True, some of the interrogation elicited information that was arguably helpful to defendant. For example, defendant stated during the interrogation that there were bags of unopened mail in his wife's car, that his wife had spent all of his inheritance, that she had not been paying the bills, and that he believed she was having an affair with a colleague at work. But defendant had testified about these same

matters on the stand, and none of these matters was contested. Other statements made during the interrogation were also consistent with defendant's testimony at trial, such as his statement that he did not recognize the vehicles as being from the sheriff's department, that his binoculars were not that strong, that he thought his wife's lover was in the car at the Boske house, that he thought the short person in the passenger seat of one of the brown cars was his wife, that he did not think he shot at the second car, that he did not realize it was a deputy until he saw his boots sticking out from under the door, and that he did not know the deputy was still there even after the dump truck departed. These statements could have been helpful to defendant, but only marginally so, inasmuch as they were duplicative of his trial testimony.

One piece of new information elicited during the interrogation was his admission that he thought he was shooting at his wife when he "shot at these guys." He added, "I just, just blew it. The wrong person died. Poor officer, was just doing his job." But this account—i.e., that he intended to shoot, but believed he was shooting at his wife—differed markedly from the version defendant provided at trial, which was that he did not aim at anyone and did not intend to shoot anyone. Thus, admission of these statements might have been important, but only in crippling defendant's credibility. (See *People v. Jones* (2003) 29 Cal.4th 1229, 1255 [131 Cal.Rptr.2d 468, 64 P.3d 762].)

Moreover, there was much in the remainder of the interrogation that was damaging as well, and some of it could be found only in the interrogation. When asked why he had covered the windows with plywood and set out the gas cans, defendant said, "I knew she was going to call the cops." Then, when asked why he opened fire before saying anything to the people outside, defendant said, "Because I knew they were going to take me to jail." Defendant conceded he fired the first shot, estimated he had fired seven shots altogether, and admitted that he had shot at more than one person. He added that he aimed at the doors because the officers were "crouched behind the doors." Defendant said he stopped firing because his gun was empty, but he crawled down the hallway to get another one.

Even worse for defendant, had the interrogation been read in its entirety, it would have undermined defendant's testimony in surrebuttal that his statement to Special Agent Fox as to the identity of the man standing outside the vehicle was a reference to what he knew at the time of the interrogation, not at the time the officers arrived at his house, and that he had been unaware these were sheriff's department vehicles. During the interrogation, defendant said he had believed, at that earlier point, that the cars had come to take him to jail, and that one of the passengers was his wife and the other passenger might be "some kind of negotiator or what." As for the drivers of the two cars, defendant said he *knew* that they were deputy sheriffs:

"[Special Agent] Eicher: We got two beige cars driving in. You got people getting out of them wearing uniforms that are waving to you, 'hey, come over here and talk to us.'

"Ervine: Only one guy stood up, the rest of them were crouched behind the doors.

"Eicher: OK. But the guy that stood up, who did you think that was?

"Ervine: He was a sheriff.

"Eicher: Was there any doubt in your mind?

"Ervine: No.

"Eicher: Who did you think the other people were?

"Ervine: Well, I knew there was a sheriff in the driver's seat of the other car too. . . . I mean. *It stands to reason a sheriff is going to be driving a sheriff's car.*" (Italics added.)

Had defendant's statements at the interrogation been presented in full to the jury, it would have increased the amount of evidence for the jury to consider. But the mix of evidence would quite likely have tipped even more favorably to the People, providing still more evidence that defendant, as he put it during the interrogation, was "guilty," did not have "any excuse for shooting that Sheriff," and believed he deserved the death penalty. Defendant could not have suffered prejudice from the exclusion of these statements. We therefore do not consider whether the rule of completeness or any hearsay exception applies.

### E. *Sufficiency of the Evidence of Attempted Murder*

Defendant was convicted of the willful, deliberate and premeditated attempted murder of Commander Freitas, Deputy Mahan, and Deputy Aldridge. The record showed that defendant shot at Freitas and Mahan and that one of the bullets even grazed Mahan's head. Defendant argues, however, that there was no evidence he aimed or shot at Aldridge and that the attempted murder conviction as to Aldridge should be reversed for insufficient evidence.

■ Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing. (*People v. Superior Court (Decker)* (2007) 41 Cal.4th 1, 7 [58 Cal.Rptr.3d 421, 157 P.3d 1017].) Defendant argues that the evidence of

intent was inadequate in that "there was no evidence that [he] aimed or shot at Aldridge, or even knew that he was present" and, further, that "only a shot fired at Aldridge would constitute the direct movement toward the commission of the attempted murder." He is wrong. (*People v. Dillon* (1983) 34 Cal.3d 441, 455 [194 Cal.Rptr. 390, 668 P.2d 697] ["the law of attempts would be largely without function if it could not be invoked until the trigger was pulled . . ."].)

The record at trial supports the inference that defendant expected the peace officers to come to his house, that he did not want to be arrested, and that he prepared an elaborate ambush, placing gas cans inside and outside the house and choosing a sniper location above the officers, to prevent being arrested. This plan, of course, would require the killing of all officers who were present. (*People v. Stone* (2009) 46 Cal.4th 131, 140 [92 Cal.Rptr.3d 362, 205 P.3d 272] ["a person who intends to kill can be guilty of attempted murder even if the person has no specific target in mind"].) Defendant was outnumbered, so he focused on those officers—Griffith, Freitas, and Mahan— who were shooting at him.[15] Defendant was injured before he could fully execute his plan, but his strategy of shooting at Freitas and Mahan constituted not only attempted murder as to those two officers but also a direct but ineffectual act toward killing Aldridge, since the elimination of the threat from Freitas and Mahan would have facilitated the task of killing Aldridge. (*People v. Smith* (2005) 37 Cal.4th 733, 741 [37 Cal.Rptr.3d 163, 124 P.3d 730] [shooter's abandonment of efforts " ' "out of necessity or fear does not compel the conclusion that he lacked the animus to kill in the first instance" ' "].) Moreover, it would be absurd to assert that defendant was unaware Aldridge was present, since each patrol vehicle had two car doors open and the second patrol vehicle obviously did not drive itself to defendant's gate. The record thus supported the conclusion that defendant intended to kill Aldridge along with the other officers and had undertaken a direct but ineffectual act toward accomplishing the intended killing by firing first at the officers who posed the most immediate threat. (See *People v. Superior Court (Decker), supra,* 41 Cal.4th at pp. 8–9.)

### F. *Asserted Instructional Error as to Attempted Murder*

Defendant launches several attacks on the instructions the court gave the jury concerning attempted murder and on the court's response to a jury question about the law of attempted murder. None of them has merit.

The court instructed the jury on attempted murder in accordance with CALJIC No. 8.66 (attempt to commit murder), as follows:

---

[15] Aldridge did not fire a shot because he was unable to get a clear view of defendant.

"Defendant is accused in Counts Two, Three, and Four of the Information of having committed the crime of attempt to commit murder, in violation of Sections 664 and 187 of the Penal Code.

"Every person who attempts to murder another human being is guilty of violation of Section 664 and 187 of the Penal Code.

"Murder is the unlawful killing of a human being with malice aforethought.

"In order to prove such crime each of the following elements must be proved: One, a direct but ineffectual act was done by one person toward killing *another human being*;

"And two, the person committing such act harbored express malice aforethought, namely, a specific intent to kill unlawfully *another human being*.

"In determining whether or not such an act was done, it is necessary to distinguish between mere preparation on the one hand and the actual commencement of the doing of the criminal deed on the other. [¶] Mere preparation which may consist of planning the killing or of devising, obtaining or arranging the means for its commission is not sufficient to constitute an attempt. [¶] However, acts of a person who intends to kill *another person* will constitute an attempt where those acts clearly indicate a certain unambiguous intent to kill. [¶] Such acts must be an immediate step in the present execution of the killing, the progress of which would be completed unless interrupted by some circumstances not intended in the original design." (Italics added.)

Focusing on the italicized words, defendant argues that this instruction allowed the jury to convict him of all three counts of attempted murder even if it concluded that he had the specific intent to kill only one of the victims and had committed a direct but ineffectual act toward killing only one of the victims. We do not find it reasonably likely the jury interpreted the instructions in the manner defendant imagines. (*People v. Osband* (1996) 13 Cal.4th 622, 679 [55 Cal.Rptr.2d 26, 919 P.2d 640].) The jury was told that defendant was charged with three separate counts of attempted murder and was given a separate verdict form, naming each victim, for each attempted murder count, requiring it to make an individual determination whether defendant had committed the crime against each victim. Moreover, the words "another human being" and "another person" in the instructions refer consistently to each alleged victim and are obviously intended to distinguish between the victim and defendant, since defendant is also referred to as a "person" in the instructions. Indeed, defendant does not point to anything in the record or in the argument of counsel to support his strained interpretation.

Defendant then points out, correctly, that the court failed to instruct the jury on the requirement of a union of an act and a wrongful intent with respect to the attempted murder, inasmuch as the version of CALJIC No. 3.31 (concurrence of act and intent) read to the jury was limited to the crime of murder and the lesser offense of manslaughter. However, CALJIC No. 8.67 (attempt to commit murder—willful, deliberate, and premeditated), which applied to the allegation attached to each attempted murder count, directed the jury to determine whether the attempted murder "was preceded *and accompanied* by a clear, deliberate intent to kill," and the jury found each such allegation true. (Italics added.) Defendant concedes that this instruction articulated a requirement that there be a concurrence of act and intent similar to that described in CALJIC No. 3.31, but asserts that the instruction nonetheless cannot be considered because it likewise was "erroneously limited to count one, the murder count." But the court, prior to dismissing the jury for deliberations, corrected its error and amended the instruction to include the attempted murder counts. Hence, the jury could not have been misled.

█ Defendant also declares the instructions deficient for omitting a unanimity instruction. In his view, the jurors should have been required unanimously to agree concerning the act or event that established each count of attempted murder. But a unanimity instruction is not required "when the acts alleged are so closely connected as to form part of one transaction" and "the defendant offers essentially the same defense to each of the acts, and there is no reasonable basis for the jury to distinguish between them." (*People v. Stankewitz* (1990) 51 Cal.3d 72, 100 [270 Cal.Rptr. 817, 793 P.2d 23].) Here, the record does not reveal any differing defenses to the various shots he fired at the officers, and defendant does not identify any, either.

Defendant's final challenge relates to the court's response to a jury question concerning attempted murder. On the second day of deliberations, the jury sent the following request concerning the attempted murder of Aldridge: "If the jury agrees that it was the defendant's intention to kill all of the officers at the front gate but was prevented from doing so by the circumstances that: A) His intended victim was hiding or not seen by the defendant[,] B) There is no direct evidence of shots fired at Deputy Aldridge[,] C) The assault was interrupted by the fact that the defendant was shot at and hit. If any or all of the above stated circumstances are true, has an attempted murder been committed?" The court responded with a question of its own: "Before it can accurately answer the jury's question, the Court must determine what the jury means by the term 'the officers at the front gate.' Does the jury mean thereby that defendant intended to kill all officers at the front gate, however many there might be? Or, does it mean that the defendant intended to kill only the officers at the front gate whom he saw?" The jury then submitted this clarification: "The jury agrees that Mr. Ervine intended to

kill all officers at the front gate, however many there might be. If Mr. Ervine never actually laid eyes on Deputy Aldridge, because the deputy was in hiding, and if there is no direct evidence of shots fired at Deputy Aldridge ([i.e.,] bullet holes in his door, Aldridge stating that he saw Ervine aiming at him, etc.), is it attempted murder?" After conferring with counsel, the court instructed the jury as follows: "Given a finding by the jury that the defendant intended to kill all officers at the front gate, however many there might be, then it may find an attempt to murder each officer if the jury finds a direct but ineffectual act done towards carrying out that original intent."

Defendant contends the instruction was erroneous in that it substituted a finding that "defendant intended to kill all persons in an open location" for the statutory requirement that defendant "had the specific intent to kill each alleged victim." Defendant misapprehends the law. As we recently explained in *People v. Stone, supra,* 46 Cal.4th 131, the intent required for attempted murder can be satisfied not only by the intent to kill a particular person, but also by "a generalized intent to kill someone." (*Id.* at p. 136.) Indeed, "a person who intends to kill can be guilty of attempted murder even if the person has no specific target in mind." (*Id.* at p. 140.) The jury's question reflected a belief that defendant intended to kill all of the officers at the front gate, however many there might be, which is sufficient evidence of intent under *Stone* for the attempted murder of Freitas, Mahan, and Aldridge. The court then instructed the jury, correctly, that a direct but ineffectual intent towards carrying out that plan could establish attempted murder. We perceive no error.

G. *Asserted Overlap Between the Special Circumstance of Murder to Avoid Arrest and the Special Circumstance of Murder of a Peace Officer*

Defendant contends that the special circumstance of murder to avoid arrest (§ 190.2, subd. (a)(5)) must be stricken because it overlaps with the special circumstance of murder of a peace officer in the performance of his duties (*id.,* subd. (a)(7)). He asserts that this result is compelled by *People v. Bigelow* (1984) 37 Cal.3d 731 [209 Cal.Rptr. 328, 691 P.2d 994] (*Bigelow*). We disagree.

In *Bigelow,* the defendant had been convicted of murder with a financial-gain special circumstance (§ 190.2, subd. (a)(1)) and a robbery-murder special circumstance (*id.,* subd. (a)(17)(A)). Because "the obvious motive of robbery is financial gain" (*People v. Montiel* (1993) 5 Cal.4th 877, 926, fn. 20 [21 Cal.Rptr.2d 705, 855 P.2d 1277]), we perceived a need to "construe special circumstance provisions to minimize those cases in which multiple circumstances will apply to the same conduct, thereby reducing the risk that

multiple findings on special circumstances will prejudice the defendant" (*Bigelow, supra,* 37 Cal.3d at p. 751). We therefore adopted a limiting construction of murder for financial gain where both of these special circumstances are charged "under which the financial gain special circumstance applies only when the victim's death is the consideration for, or an essential prerequisite to, the financial gain sought by the defendant." (*Ibid.*)

 *Bigelow* then considered the scope of the special circumstance of murder to avoid an arrest. We observed that the prosecutor's broad reading would allow a "claim that the victim was killed not only to prevent him from testifying in court but also to prevent him from reporting the crime to the police, and the result would be to extend the avoiding arrest circumstance to virtually all felony murders." (*Bigelow, supra,* 37 Cal.3d at p. 752, fn. 13.) In order to avoid "a reading which would cause that circumstance to overlap extensively with felony murder," we declared that the special circumstance of avoiding arrest "should be limited to cases in which the arrest is imminent." (*Id.* at p. 752.)[16]

Although we sought to reduce the risk of overlap in *Bigelow,* we did not purport to entirely eliminate any possibility of overlapping special circumstances. (See *People v. Silverbrand* (1990) 220 Cal.App.3d 1621, 1630 [270 Cal.Rptr. 261].) In *People v. Melton* (1988) 44 Cal.3d 713 [244 Cal.Rptr. 867, 750 P.2d 741], we addressed a defendant's argument that the burglary-murder and robbery-murder special circumstances were overlapping, in that they described essentially the same conduct with a single criminal intent and thus would artificially inflate the number of special circumstances the jury might consider at the penalty phase. (*Id.* at p. 765.) We rejected this challenge to the special circumstances, noting that the jury would have been entitled to consider that the robber-murderer also committed a burglary to gain access to the victim even if the burglary-murder special circumstance had not been alleged, and that it was "constitutionally legitimate for the state to determine that a death-eligible murderer is more culpable, and thus more deserving of death, if he not only robbed the victim but committed an additional and separate felonious act, burglary, in order to facilitate the robbery and murder. Robbery involves an assaultive invasion of personal integrity; burglary a separate invasion of the sanctity of the home. Society may deem the violation of each of these distinct interests separately relevant to the seriousness of a capital crime." (*Id.* at p. 767.) In reaching our conclusion, we explicitly rejected the defendant's attempt to graft the sentencing rules derived from section 654 onto the death penalty scheme. (*Melton, supra,* 44 Cal.3d at pp. 767–768.) Thus, although defendant purports to find an impropriety "[w]here two (or more) special circumstances are alleged based on the same course of conduct," our post-*Bigelow* cases have explicitly upheld findings of

---

[16] Defendant does not contend that his arrest here was not imminent.

"multiple special circumstances arising out of the same course of conduct." (*People v. Andrews* (1989) 49 Cal.3d 200, 224 [260 Cal.Rptr. 583, 776 P.2d 285].)

 Accordingly, we do not read *Bigelow* to prevent the imposition of both of the special circumstances here—and, indeed, defendant concedes that we have never before questioned the validity of these special circumstances when imposed together. (E.g., *People v. Cummings* (1993) 4 Cal.4th 1233, 1255 [18 Cal.Rptr.2d 796, 850 P.2d 1]; *People v. Daniels* (1991) 52 Cal.3d 815, 837 [277 Cal.Rptr. 122, 802 P.2d 906].) Unlike the overlap between the robbery-murder special circumstance and the financial-gain special circumstance, where the latter is invariably the motive for the former—or the overlap between "virtually all" felony-murder special circumstances and a broad reading of the avoiding-arrest special circumstance (*Bigelow, supra,* 37 Cal.3d at p. 752, fn. 13)—the special circumstances at issue here can (and often do) apply independently. The special circumstance of murder to avoid arrest may apply even if the victim is not a peace officer (e.g., *People v. Vorise* (1999) 72 Cal.App.4th 312, 322 [85 Cal.Rptr.2d 12] [victim was killed after his wife said she was going to call the police]), and the special circumstance of murder of a peace officer in the performance of his duties may apply even if the officer was not attempting to effect an arrest. (E.g., *People v. Gonzalez* (1990) 51 Cal.3d 1179, 1218 [275 Cal.Rptr. 729, 800 P.2d 1159] [peace officer was killed while executing a search warrant].) Indeed, the record here supports a finding that Deputy Griffith was murdered while he was engaged in the investigation of a domestic violence report, which was also a lawful part of his duties, and the jury was instructed on that theory.

Moreover, as with the robbery-murder and burglary-murder special circumstances, these special circumstances protect distinct societal interests. The special circumstance of murder to avoid arrest protects society's interest in " 'the due apprehension of criminals.' " (*United States v. Watson* (1976) 423 U.S. 411, 419 [46 L.Ed.2d 598, 96 S.Ct. 820].) The special circumstance of murder of a peace officer protects peace officers, on whom we depend "to help ensure safe and peaceable communities." (*People v. Brown* (2004) 33 Cal.4th 382, 400 [15 Cal.Rptr.3d 624, 93 P.3d 244].) This state has reasonably deemed the violation of each of these distinct interests to be separately relevant to the seriousness of a capital crime. We therefore reject defendant's contention that the special circumstance of murdering "a peace officer in the performance of his duties . . . *necessarily subsumed* the special circumstance of murder to avoid arrest."

### IV. PENALTY PHASE ISSUES

A. *Admissibility of Victim Impact Testimony*

Sheriff Jarrell, who had hired Deputy Griffith, testified at the penalty phase about the effect of Griffith's murder on the members of the Lassen County Sheriff's Department. Defendant contends the evidence was inadmissible under section 190.3, factor (a) and violated his state and federal rights to due process and a reliable penalty determination.

■■■ " 'Unless it invites a purely irrational response from the jury, the devastating effect of a capital crime on loved ones and the community is relevant and admissible as a circumstance of the crime under section 190.3, factor (a).' (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1056–1057 [47 Cal.Rptr.3d 467, 140 P.3d 775].) 'The federal Constitution bars victim impact evidence only if it is "so unduly prejudicial" as to render the trial "fundamentally unfair." ' (*Id.* at p. 1056, quoting *Payne v. Tennessee* (1991) 501 U.S. 808, 825 [115 L.Ed.2d 720, 111 S.Ct. 2597].)" (*People v. Cruz* (2008) 44 Cal.4th 636, 682 [80 Cal.Rptr.3d 126, 187 P.3d 970].) Neither standard was violated here.

Sheriff Jarrell testified that all of the members of his "very close" and cohesive department, along with their families, were struck with grief at the loss of Deputy Griffith, and that two counselors were brought in to provide them some comfort. The peace officers struggled with the "abrupt" realization of their own vulnerability, which caused many to have doubts about their abilities. Deputy Aldridge, in particular, quit because he wanted "to be able to see his kids grow up." The remaining officers have increased their requests for backup when responding to domestic violence calls. The dispatchers, too, were upset, and the one who sent Deputy Griffith to respond to the call still "has difficulty dealing with that reality." Sheriff Jarrell also recalled his own feelings of anger, helplessness, and desire for retribution.

Defendant complains that Sheriff Jarrell's testimony went beyond *Payne*'s "limited definition of who is a victim and what testimony is permissible in describing the impact or harm of a crime," but his complaint lacks legal support. As we have previously observed, victim impact evidence is not limited to the effect of the victim's death on family members (*People v. Pollock* (2004) 32 Cal.4th 1153, 1183 [13 Cal.Rptr.3d 34, 89 P.3d 353]), but may include its effects on the victim's friends, coworkers, and the community (*People v. Huggins* (2006) 38 Cal.4th 175, 222, 238–239 [41 Cal.Rptr.3d 593, 131 P.3d 995] [testimony from friends and coworkers mourning the loss of the victim and describing the erection of a bronze statue of the victim by the community was relevant to the circumstances of the crime]; accord,

*McClain v. State* (1996) 267 Ga. 378, 387 [477 S.E.2d 814, 824] ["the trial court has discretion to question witnesses regarding the effect of the victim's death on the community"]). Nor are victim impact witnesses limited to expressions of grief, for our case law permits a showing of "the specific harm caused by the defendant" (*People v. Edwards, supra*, 54 Cal.3d at p. 835), which encompasses the spectrum of human responses, including anger and aggressiveness (*People v. Gutierrez* (2009) 45 Cal.4th 789, 802 [89 Cal.Rptr.3d 225, 200 P.3d 847]), fear (*People v. Wilson* (2005) 36 Cal.4th 309, 357 [30 Cal.Rptr.3d 513, 114 P.3d 758]), and an inability to work (*Gutierrez, supra*, 45 Cal.4th at p. 802). Nor does the admissibility of such evidence render section 190.3, factor (a) unconstitutionally vague. (*Wilson, supra*, 36 Cal.4th at p. 358.)

In fact, the federal courts have permitted testimony very similar to Sheriff Jarrell's. In *U.S. v. Battle* (11th Cir. 1999) 173 F.3d 1343, for example, the Eleventh Circuit upheld the trial court's decision allowing three prison guards to testify about the effect of a fellow officer's death on the staff and the inmates. The court reasoned that the witnesses' testimony was "about harm to the Atlanta prison staff—how the murder of a coworker and the resulting sentence for his killer would affect them." (*Id.* at p. 1349.) Their testimony, like the sheriff's testimony here, was neither inflammatory nor emotionally charged, and consisted of short, matter-of-fact descriptions of the effect of the crime. (*Id.* at p. 1348.) In *Battle*, as in this case, no one described the defendant "as a beast who must be killed" or conveyed hatred toward the defendant or the viciousness of his crimes. (*Id.* at p. 1349.) "[I]n short, no [witness] could have been said to have inflamed the jury." (*Ibid.*) Similarly, here, the testimony was not unduly prejudicial.

*U.S. v. Wilson* (E.D.N.Y. 2006) 493 F.Supp.2d 364 offers additional authority for our conclusion. There, the district court allowed testimony from fellow New York Police Department (NYPD) officers to demonstrate " 'the chilling effect' " of defendant's crimes on NYPD undercover detectives, including evidence that some officers "were 'refusing to go out on the street, do these operations because of the danger, how some even retired from undercover work.' " (*Id.* at p. 395; accord, *U.S. v. Cheever* (D.Kan. 2006) 423 F.Supp.2d 1181, 1210–1211 [permitting officers of the Greenwood County Sheriff's Department to testify about the impact of the sheriff's death on the department].)[17]

---

[17] Defendant's reliance on *Lambert v. State* (Ind. 1996) 675 N.E.2d 1060, which disallowed testimony from fellow police officers about the effect of the victim's death on them, is misplaced. *Lambert* found error in the admission of such testimony on the ground that it was not relevant to the sole statutory aggravating circumstance under Indiana law. (*Id.* at p. 1064.) Indiana law, unlike California's, does not include the circumstances of the crime as an

██ We also find no error with respect to the prosecutor's remark during closing argument that "[w]hat you have here is a case where the defendant has literally ripped apart the fabric of society in Lassen County in particular." Not only did defendant forfeit any claim by failing to object to this remark at trial (*People v. Brown, supra,* 33 Cal.4th at pp. 398–399), but the prosecutor's remark was a fair comment on the evidence (*id.* at pp. 399–400).

We do agree with defendant, though, that it was inappropriate for the prosecutor to ask Sheriff Jarrell whether it was "acceptable" to him "to allow the system and a jury [to] decide the appropriateness of the level of responsibility for this crime," inasmuch as the Eighth Amendment, even after *Payne,* still bars the admission of a victim's "opinions about the crime, the defendant, and the appropriate sentence." (*Payne v. Tennessee, supra,* 501 U.S. at p. 830, fn. 2.) Defendant was not prejudiced by the sheriff's response, however, which expressed his belief that "society's representatives would hold Mr. Ervine appropriately accountable for his conduct." (See *People v. Lewis and Oliver, supra,* 39 Cal.4th at p. 1058.)

### B. *Exclusion of Expert Testimony Concerning the Conditions of Confinement in Prison*

Defendant offered the testimony of Edward George, a former employee of the Department of Corrections and Rehabilitation, to testify as an expert as to the conditions of confinement should defendant be sentenced to a term of life imprisonment without the possibility of parole and provide a "thumbnail sketch of what a daily regimen would amount to." The defense proposed to have George testify that prisoners under those conditions "generally are not disciplinary problems" and "usually lead exemplary lives within the confines of the prison." The defense did not propose to have George opine as to *defendant's* behavior in particular, although George had met with defendant and was "familiar with this case." The trial court excluded the testimony as irrelevant, and defendant now claims that ruling violated section 190.3 as well as his rights under the Fifth, Sixth, and Fourteenth Amendments to the federal Constitution and parallel provisions of the California Constitution.

██ "We have previously held that evidence of the conditions of confinement that a defendant will experience if sentenced to life imprisonment without parole is irrelevant to the jury's penalty determination because it does not relate to the defendant's character, culpability, or the circumstances of the offense. (*People v. Daniels*[, *supra,*] 52 Cal.3d 815, 876–878 . . . ; *People v. Thompson* (1988) 45 Cal.3d 86, 138–139 [246 Cal.Rptr. 245, 753 P.2d 37].) Its admission is not required either by the federal Constitution or by Penal

---

aggravating factor. (Compare § 190.3, factor (a) with Ind. Code Ann. § 35-50-2-9(b); see *Prowell v. State* (Ind. 1997) 687 N.E.2d 563, 567–568.)

Code section 190.3." (*People v. Quartermain* (1997) 16 Cal.4th 600, 632 [66 Cal.Rptr.2d 609, 941 P.2d 788].) The same prohibition does not apply, however, to evidence of defendant's probable future conduct in prison. (E.g., *Skipper v. South Carolina* (1986) 476 U.S. 1, 5 [90 L.Ed.2d 1, 106 S.Ct. 1669] ["evidence that the defendant would not pose a danger if spared (but incarcerated) must be considered potentially mitigating"]; accord, *People v. Fudge* (1994) 7 Cal.4th 1075, 1117 [31 Cal.Rptr.2d 321, 875 P.2d 36] [error to exclude evidence that defendant would lead a productive and nonviolent life in prison].)

In this case, the testimony proffered by the defense fell into the former category, not the latter. Indeed, even after the parties discussed the distinction between evidence of the rigors of confinement and evidence of a defendant's past behavior as an inmate or future suitability as a life prisoner, defense counsel reiterated that he did "not intend to ask Mr. George his opinion concerning Mr. Ervine's future behavior within the prison." We note as well that the defense offered no other evidence to predict defendant's behavior in prison. (Cf. *People v. Garceau* (1993) 6 Cal.4th 140, 204 [24 Cal.Rptr.2d 664, 862 P.2d 664] [evidence that the defendant had been " 'a model prisoner' " and had successfully adjusted to prison life].)

Defendant contends that the George testimony was nonetheless admissible because general evidence of the conditions of confinement would tend to support the argument that defendant, in particular, would "adjust peacefully to prison life." But such an inference would be completely speculative. (*People v. Jones, supra,* 29 Cal.4th at p. 1261.) Evidence that inmates under a sentence of life imprisonment without the possibility of parole are confined in a secure setting does not in itself tend to show that a particular defendant "would be unlikely to engage in violence." (*Ibid.*; see also *People v. Daniels, supra,* 52 Cal.3d at p. 878 ["evidence of the manner of execution or confinement does not relate to the character or record of the defendant"]; cf. *Skipper v. South Carolina, supra,* 476 U.S. at p. 4 ["the only question before us is whether the exclusion from the sentencing hearing of the testimony petitioner proffered regarding his good behavior during the over seven months he spent in jail awaiting trial deprived petitioner of his right to place before the sentencer relevant evidence in mitigation of punishment"].)

### C. *Asserted Error in the Instructions Concerning Future Dangerousness*

During closing argument, the prosecutor alluded to defendant's likely behavior if incarcerated: "You may also want to be aware of any argument that, well, the lenient gift, punishment of life without [the possibility of parole] is easier and okay because it will be adequate to protect society by

locking this defendant up. [¶] Well, first of all, that's a fallacious argument, too. Number one, it avoids doing justice, the job that you're here to do, that is, determining the appropriate penalty. [¶] Number two, that argument asks you to speculate about what he'll do locked up in prison, and none of us know that. [¶] We do know what he does to cops when he, when he doesn't want 'em to arrest him, but we shouldn't be speculating on that when we make decisions like this." In the defense argument, apparently in response to this point, counsel noted for the jury "that there's been no evidence . . . offered by the prosecution that [defendant] would pose any type of a management problem in prison. There's no evidence to that effect at all."

After the jury had been excused, the prosecutor complained that this portion of the defense argument had highlighted the prosecution's failure to present evidence the defense knew the prosecution was not permitted to present (see *People v. Boyette* (2002) 29 Cal.4th 381, 446 [127 Cal.Rptr.2d 544, 58 P.3d 391]): "[T]his business about he argued that the DA didn't put on any evidence about him not being a management problem in prison. He knows full well, I am not allowed by law to put on an expert to do that. [¶] It's almost like he takes everything that would be prejudicial, reversible error in a death case, as reported in the cases, and says, 'Well, the DA didn't do that and he should have.' " The prosecutor proposed the jury be instructed that "[i]f there was any argument or insinuation that the prosecutor should have put on an expert or evidence concerning the defendant's future violence, I am instructing you that the prosecutor is not permitted to do so under the law, and you're to draw no inference from that." Defense counsel said he had no objection to the admonition. The court recessed to consider this proposed instruction, as well as another concerning the defense's attempt to invoke intercase proportionality (see pt. IV.E, *post*) and returned with the following language to address both issues: "If during argument any assertion or insinuation was made that you should compare defendant's conduct in this case with other cases, or that there was a failure of proof regarding the defendant's propensity to violence if in prison, you will disregard such entirely. Neither is an appropriate consideration for the jury in selecting the penalty, and no evidence was introduced in such regards because both are irrelevant." Once again, defense counsel said he had no objection to the admonition, and it was included in the instructions given to the jury.

Defendant now claims the instruction erroneously removed the issues of future dangerousness (or lack thereof) and his ability to adjust to life in prison from the jury's consideration, thereby depriving him of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution and parallel provisions of the state Constitution. The claim lacks merit.

■ "The law is settled: expert testimony that a capital defendant will pose a danger in the future if his life is spared is inadmissible (*People v. Murtishaw* (1981) 29 Cal.3d 733, 773–775 [175 Cal.Rptr. 738, 631 P.2d 446]), but 'prosecutorial argument regarding defendant's future dangerousness is permissible when based on evidence of the defendant's conduct rather than expert opinion' . . . ." (*People v. Boyette, supra*, 29 Cal.4th at p. 446.) In this case, the prosecutor did not offer expert testimony concerning defendant's future dangerousness but did, in accordance with our case law (*People v. Ray* (1996) 13 Cal.4th 313, 353 [52 Cal.Rptr.2d 296, 914 P.2d 846]), argue that defendant's violent behavior towards his wife and towards the sheriff's deputies indicated that prison would not be suitable for him. The defense argued, again in accordance with our case law (*People v. Harris* (2005) 37 Cal.4th 310, 357–358 [33 Cal.Rptr.3d 509, 118 P.3d 545]), that the murder was an aberration committed because of "the forces operat[ing] on [defendant] the night that this happened" and his "lack of criminal history," and that defendant thus would adjust well to prison. The defense stepped over the line, though, when it *also* pointed out that the People had failed to introduce *evidence* "that [defendant] would pose any type of management problem in prison," since we barred the People from introducing just that type of evidence in *Murtishaw*.[18]

It is arguable that the court's instruction failed to preserve the distinction above. Although the instruction correctly cautioned the jury to disregard "any assertion or insinuation . . . that *there was a failure of proof* regarding the defendant's propensity to violence if in prison" and informed them that the *absence of proof* was not "an appropriate consideration for the jury in selecting the penalty," the final clause of the instruction may have confused the issue. That clause provided that "no evidence was introduced in such regards because both are irrelevant." If the jury interpreted this clause to mean that "no evidence was introduced regarding the defendant's propensity to violence if in prison because the defendant's propensity for violence in prison is irrelevant," then it would have failed to consider a relevant consideration in selecting the penalty.

Even if there were a reasonable likelihood the jury interpreted the instruction in this manner, though, there is no reasonable possibility it affected the verdict. The issue concerning defendant's future dangerousness was not a significant part of the argument, and it did not strongly favor either side.

---

[18] Defendant reasons that since the People may comment, in a given case, on the lack of evidence that the defendant could be rehabilitated (*People v. Garceau, supra*, 6 Cal.4th at p. 205) or that the defendant suffered from a mental disorder (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1170–1171 [63 Cal.Rptr.3d 297, 163 P.3d 4]), it necessarily follows that the defense argument here was proper. But he ignores the critical distinction that a defendant is free to introduce evidence that he could be rehabilitated or suffered from a mental disorder. (See § 190.3, factors (h), (k).) When a defendant fails to do so, it is worthy of comment.

Although defendant had no prior criminal record, the current crimes were highly aggravated and tended to show that defendant would act violently against peace officers in the future. Thus, even if the jurors erroneously believed they could not consider defendant's propensity for violence in prison as a factor for or against a particular penalty, there was no reasonable possibility of prejudice. (See *People v. Harris, supra,* 37 Cal.4th at pp. 357–358; *People v. Clair* (1992) 2 Cal.4th 629, 681, fn. 12 [7 Cal.Rptr.2d 564, 828 P.2d 705].)

### D. *Asserted Error in Failing to Instruct on the Meaning of Life Imprisonment Without the Possibility of Parole*

Defendant requested an instruction providing that "[a] sentence of life without the possibility of parole means that [defendant] will remain in a state prison for the rest of his life and will not be paroled at any time." The trial court refused the request but added that it would "consider further instructions in the event of an inquiry from the jury on the issue." No such inquiry was made, however, and the jury was instructed, in accordance with CALJIC No. 8.84, that it was its task to determine whether defendant was to be sentenced to "death or confinement in the state prison for life without possibility of parole." We have repeatedly deemed this pattern instruction an adequate definition of the alternative sentence to death, and have likewise rejected defense efforts to rely on contemporary opinion surveys, not part of the current record or subject to cross-examination, suggesting that many jurors do not understand that life without the possibility of parole actually means no possibility of parole. (*People v. Lindberg* (2008) 45 Cal.4th 1, 53 [82 Cal.Rptr.3d 323, 190 P.3d 664]; *People v. Abilez* (2007) 41 Cal.4th 472, 527–528 [61 Cal.Rptr.3d 526, 161 P.3d 58]; *People v. Boyer, supra,* 38 Cal.4th at p. 487.)

### E. *Asserted Error in Instructing the Jury Not to Compare Defendant's Conduct to That in Other Capital Cases*

Both the prosecutor and defense counsel occasionally referred to generic murder scenarios presenting different fact patterns in an effort to highlight the aggravating or mitigating circumstances of defendant's crime. The prosecutor's discussion of the sentencing factors pointed out that this murder was not like "a stickup in a store and [a] store employee grabs for the gun and the robber shoots him" but was instead "a calculated murder of a cop" (see § 190.3, factor (a)); that this scenario was not "your Patty Hearst type of thing where somebody kidnaps you and psychologically abuses you or at gunpoint forces you to go do a crime" (see § 190.3, factor (g)); that defendant

was not "a person who as a result of a mental problem can't appreciate the fact that he's killing somebody" (see § 190.3, factor (h)); and that defendant was not a "16-year-old kid with no life experience who does one wild and crazy thing in his life" but "a 45-year-old man who's made adult decisions, and has made a real calculated plan to kill folks" (see § 190.3, factor (i)). Defense counsel similarly remarked that this was not a crime "that was committed during the course of a serious underlying felony, for example, robbery" or for financial gain (see § 190.3, factor (a)), nor was it a senseless murder of a store clerk to fuel a drug habit (see *ibid.*), but "arose tragically from a domestic dispute." These remarks were fair comment on the evidence. (*People v. Hinton* (2006) 37 Cal.4th 839, 906 [38 Cal.Rptr.3d 149, 126 P.3d 981].)

When defense counsel stated that "[t]his case is not about someone driven by lust, that rapes and sodomizes 14 boys down in southern California and throws their bodies on the freeway," though, the prosecutor objected to counsel's transparent reference to William Bonin, the so-called "Freeway Killer," who had been convicted of murdering 14 boys and young men, some of whom he had sodomized, and who had been executed amid widespread publicity less than two weeks earlier. (See *People v. Bonin* (1988) 47 Cal.3d 808 [254 Cal.Rptr. 298, 765 P.2d 460]; *People v. Bonin* (1988) 46 Cal.3d 659 [250 Cal.Rptr. 687, 758 P.2d 1217].) The prosecutor declared that the reference to the *Bonin* case was impermissible and proposed the jury be instructed that "If there was any argument or insinuation that you are to engage in a comparison of the facts and circumstances of this case to any other notorious murder case, you are not to do so, it would be improper. You are to decide this case upon the facts presented in this case alone."

The court agreed that the reference to William Bonin was "plainly inappropriate" and worried about "the jury going in there and arguing, well, it's not as bad as [Bonin]. He didn't kill fourteen." Defense counsel apologized to the court, admitting that "I made my bed," and submitted the matter. The court recessed to consider the prosecutor's proposed instruction as well as another proposed instruction concerning a defense attack on the People's failure to present evidence of future dangerousness (see pt. IV.C, *ante*) and returned with the following language, which was read to the jury without objection: "If during argument any assertion or insinuation was made that you should compare defendant's conduct in this case with other cases, . . . you will disregard such entirely. [That is not] an appropriate consideration for the jury in selecting the penalty, and no evidence was introduced in such regards because [it is] irrelevant."

Defendant now claims that the court's instruction nullified his ability to argue that his crime was not within that group of highly aggravated cases

deserving of the death penalty. We disagree. The instruction did not limit the jury's ability to compare defendant's crime to the various generic or hypothetical scenarios invoked by the People or defendant *except* to the extent defendant had attempted to compare his circumstances to Bonin's. Inasmuch as we have regularly upheld a trial court's discretion to control the scope of oral argument "by refusing to allow defense counsel to compare the subject crime to other well-known murders" (*People v. Hughes* (2002) 27 Cal.4th 287, 400 [116 Cal.Rptr.2d 401, 39 P.3d 432]), no error occurred.

▮ Defendant contends that *People v. Rodriguez* (1986) 42 Cal.3d 730 [230 Cal.Rptr. 667, 726 P.2d 113] authorizes his argument, but the case does not help him. In *Rodriguez*, we observed that "the purpose of 'aggravating' and 'mitigating' factors is to assess the seriousness of a capital crime in relation to others of the same general character," in that (for example) the absence of a mitigating element "may weigh against a finding that the instant offense is less serious than 'normal' " (*id.* at p. 788), but we did not indicate that the jury ought to use the sentencing factors to compare the seriousness of other crimes committed by *specific* defendants and the sentences they received. Rather, as we have explained, "the question of the punishment meted out to persons other than the defendant is generally not relevant to the penalty determination." (*People v. Lucas* (1995) 12 Cal.4th 415, 497–498 [48 Cal.Rptr.2d 525, 907 P.2d 373]; see also *People v. Hinton, supra,* 37 Cal.4th at p. 907 ["The prosecutor nowhere asked the jury to consider the punishment meted out to persons other than defendant."]; *People v. Sanders* (1995) 11 Cal.4th 475, 554–555 [46 Cal.Rptr.2d 751, 905 P.2d 420].) Counsel in this case was barred from making that specific improper argument, but was still able to make his central point that there had been murders involving "more shocking, heinous, cruel or callous facts than those present here." (*People v. Marshall* (1996) 13 Cal.4th 799, 854 [55 Cal.Rptr.2d 347, 919 P.2d 1280].)

Defendant points out that he made no explicit reference to the punishment any other defendant had received. It is true that defendant did not utter Bonin's name, but his description of these notorious murders was sufficient in that setting, less than two weeks after Bonin's execution, to alert the jurors to the recent events. Indeed, defense counsel never questioned the prosecutor and the court's claim that he had made a comparison to the *Bonin* case, but apologized and admitted, "I made my bed."

Finally, defendant argues that the court's instruction swept too broadly and precluded the jury from comparing the seriousness of his crime to others of the same general character. But, as set forth above, the instruction was concerned with comparing defendant's crime to other "cases"—not to other

types of murders generally, which was the bulk of defendant's argument to the jury. The court's instruction certainly extended no further than the admonition in *People v. Roybal* (1998) 19 Cal.4th 481 [79 Cal.Rptr.2d 487, 966 P.2d 521], which instructed the jury "that they 'may not attempt to compare this crime, this murder, with any other murder.' " (*Id.* at p. 529.) Accordingly, here, as in *Roybal*, "[t]he jurors were not instructed that they should not consider the defendant's central point . . ." of his argument in mitigation. (*Ibid.*; see also *People v. Benavides* (2005) 35 Cal.4th 69, 110 [24 Cal.Rptr.3d 507, 105 P.3d 1099] [approving an instruction that " 'you are not to go back and to consider what other jurors may or may not have done in any particular case at any particular time because you were not there' "].)

### F. *Asserted Error in Rejecting the Defense Instruction on Mercy*

The defense requested the jury be instructed that "[a]t the penalty phase, you may consider sympathy, pity, compassion, or mercy for the defendant that has been raised by any aspect of the offense or of the defendant's background or character in determining the appropriate punishment. [¶] . . . [¶] You may decide that a sentence of life without possibility of parole is appropriate for the defendant based upon the sympathy, pity, compassion or mercy you felt as a result of the evidence adduced during the penalty phase." The court gave the instruction to the jury, minus the word "mercy" in each of the sentences above, leaving the jury to consider sympathy, pity, and compassion. The court also made "an order in limine, that I don't think mercy should be argued by either side." Defendant complains that the court's failure to include the word "mercy" in its instructions, and its ruling barring reference to "mercy" in argument by either side violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution and parallel provisions of the state Constitution.

■■■ As defendant concedes, we have repeatedly rejected the claim that omission of "mercy" from the jury instructions constitutes error. The jury here was instructed pursuant to CALJIC No. 8.85 (penalty trial—factors for consideration), which directs the jury to consider "any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime, and any sympathetic or other aspect of the defendant's character or record that the Defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial." As we have previously explained, CALJIC No. 8.85 adequately instructs the jury concerning the circumstances that may be considered in mitigation, including sympathy and mercy. (*People v. Burney* (2009) 47 Cal.4th 203, 261 [97 Cal.Rptr.3d 348, 212 P.3d 639].) We therefore "must assume the jury already understood it could consider mercy and compassion." (*People v. Brown* (2003) 31 Cal.4th 518, 570 [3 Cal.Rptr.3d 145, 73 P.3d 1137].)

Moreover, the jury also was told that it "may consider sympathy, pity, or compassion for the defendant that has been raised by any aspect of the offense or of the defendant's background or character in determining the appropriate punishment" and that it "may decide that a sentence of life without possibility of parole is appropriate for the defendant based upon the sympathy, pity, or compassion you felt as a result of the evidence adduced during the penalty phase." Inasmuch as "mercy" and "compassion" are synonymous in this context (see Oxford English Dict. Online (draft rev. June 2009) <http://dictionary.oed.com> [as of Dec. 7, 2009] [mercy]), there is no reasonable likelihood the jury was misled as to its ability to grant defendant mercy.

For similar reasons, the trial court did not err in directing the parties to refer to sympathy, pity, or compassion instead of mercy in argument. This ruling was not, as defendant asserts, one that prevented him from requesting leniency; it merely guided the language he was to use in requesting leniency, replacing the word "mercy" with a synonym that did not connote an emotional response to the mitigating evidence instead of a reasoned moral response. (*People v. Avila* (2009) 46 Cal.4th 680, 722–723 [94 Cal.Rptr.3d 699, 208 P.3d 634]; *People v. McPeters* (1992) 2 Cal.4th 1148, 1195 [9 Cal.Rptr.2d 834, 832 P.2d 146] ["The unadorned use of the word 'mercy' implies an arbitrary or capricious exercise of power rather than reasoned discretion based on particular facts and circumstances."]; cf. *People v. Ochoa* (1998) 19 Cal.4th 353, 459 [79 Cal.Rptr.2d 408, 966 P.2d 442] [omission of "pity" was not error where "sympathy" was "essentially synonymous"]; see generally *Saffle v. Parks* (1990) 494 U.S. 484, 492–493 [108 L.Ed.2d 415, 110 S.Ct. 1257].) The defense closing argument emphasized the jury's "enormous discretion" to select the appropriate penalty and urged the jury to exercise it "and to temper justice with compassion," which is "an admirable virtue." No aspect of defendant's background he now identifies—his "quiet upbringing," his mother's death while he was a teenager, his service in Vietnam, his role as caregiver for his father until his death, his wife's betrayal, and the testimony of his friends and neighbors—would have weighed more heavily had the jury been explicitly instructed as to mercy in addition to compassion.

Finally, we discern no misconduct in the prosecution's closing argument. The prosecutor never told the jury it could not consider mercy.[19] Nor did the prosecutor tell the jury, contrary to the instructions, that it could not extend sympathy, pity, or compassion to defendant. Rather, he simply told the jury

---

[19] The trial court stated that it would reverse its ruling and include "mercy" in the instruction "[i]f the prosecutor argues it." Defendant thus forfeited this aspect of his claim by failing to interpose any objection to the prosecutor's argument below. (*People v. Rogers* (2009) 46 Cal.4th 1136, 1181 [95 Cal.Rptr.3d 652, 209 P.3d 977].)

that, on this record, defendant was undeserving of its sympathy, pity, or compassion. This was not error. (*People v. Rogers, supra*, 46 Cal.4th at p. 1181.)

G. *Asserted Error in Omitting Instructions on General Evidentiary Principles*

Prior to opening statements at the penalty phase, the court instructed the jury with the basic principles governing its sentencing function and directed them to "disregard any jury instruction given to you in the guilt determination of this trial which conflicts with these princip[les]." At the instructional conference after the close of evidence, the court advised the parties that it would supply the jury with the entire written set of the guilt phase instructions. The court then instructed the jury in the language of CALJIC No. 8.84.1, which provides in pertinent part, "You will now be instructed as to all the law that applies to the penalty phase of this trial. . . . You must accept and follow the law that I shall state to you. Disregard all other instructions given to you in other phases of this trial." Contrary to the recommendation in the Use Note to CALJIC No. 8.84.1, though, the trial court did not orally reinstruct the jury with applicable instructions regarding the evaluation of evidence.

Defendant now asserts that the death penalty must be reversed because the trial court failed to reinstruct the jury orally regarding circumstantial evidence; prior consistent or inconsistent statements; the assessment of testimony and admissions; the significance of statements of counsel and objections sustained; and the jurors' duty to deliberate, to give their individual opinions, and to accept the law as instructed. (CALJIC Nos. 1.00, 1.02, 2.00, 2.01, 2.02, 2.13, 2.20, 2.21.1, 2.21.2, 2.22, 2.27, 17.40, 17.41.) The error, he claims, violated state law (see *People v. Moon* (2005) 37 Cal.4th 1, 37 [32 Cal.Rptr.3d 894, 117 P.3d 591]) as well as the Sixth, Eighth and Fourteenth Amendments to the federal Constitution and parallel provisions of the state Constitution.

We note first that the assumption underlying defendant's argument—i.e., that the jury was unaware that it should apply the written instructions it had been given from the guilt phase—is dubious. The isolated sentence in CALJIC No. 8.84.1 directing the jury to "[d]isregard all other instructions given to you in other phases of this trial" must be read in conjunction with the court's earlier instruction to "disregard any jury instruction given to you in the guilt determination of this trial *which conflicts with these princip[les]*" and the court's subsequent instruction with respect to section 190.3, factor (b) that the

elements of assault with a deadly weapon "have been previously described to you, in your earlier set of instructions *which you will have in the juryroom.*" (Italics added.) Considering the penalty phase instructions as a whole (*People v. Mayfield, supra,* 14 Cal.4th at p. 777), combined with the fact the jury was supplied with a written set of the guilt phase instructions, we do not see a reasonable likelihood the jury failed to understand that it was to apply those earlier written instructions to the extent they were not inconsistent with the new instructions the court was providing. (*People v. Harris* (2008) 43 Cal.4th 1269, 1320 [78 Cal.Rptr.3d 295, 185 P.3d 727] ["the jury was given the guilt phase instructions in written form, and would reasonably have understood that they could therefore consider them"]; cf. *People v. Moon, supra,* 37 Cal.4th at p. 36 [finding error where the court failed to reinstruct the jury, the written copies of the guilt phase instructions were retrieved from the jury, and the jury was told " '*not to refer to the instructions previously given to you any further*' "].)

We note as well that defendant forfeited any claim with respect to the failure to reinstruct in particular on the respective duties of the judge and jury and the concluding instructions "by failing to request such instructions at trial." (*People v. Wilson* (2008) 43 Cal.4th 1, 30 [73 Cal.Rptr.3d 620, 178 P.3d 1113].)

But even if his entire claim had been preserved, and even if the jury misunderstood its duty to apply the appropriate guilt phase instructions, defendant was not prejudiced. Defendant does not explain how the absence of these instructions could have affected the jury's evaluation of the evidence adversely to him (*People v. Brasure* (2008) 42 Cal.4th 1037, 1073–1074 [71 Cal.Rptr.3d 675, 175 P.3d 632]), and the jury would have independently applied many of the points made in the instructions, which the jury had already heard at the guilt phase, as a matter of "common sense" or "logic." (*People v. Harris, supra,* 43 Cal.4th at p. 1320; see also *People v. Lewis, supra,* 43 Cal.4th at pp. 535–536 & fn. 30.)

H. *Asserted Error in the Instructions Concerning the Uncharged Offense of Assault with a Deadly Weapon*

█ "[T]here is no sua sponte duty at the penalty phase to instruct on the elements of 'other crimes' introduced in aggravation . . . ." (*People v. Montiel, supra,* 5 Cal.4th at p. 942.) However, "when such instructions are given, they should be accurate and complete." (*Ibid.*)

In this case, both parties asked the court to refer the jury to the instructions concerning assault with a deadly weapon that had been provided at the guilt phase. The court agreed to do so and instructed the jury at the penalty phase

as follows: "Evidence has been introduced for the purpose of showing that the Defendant has committed the following criminal act: Assault with a deadly weapon upon the person of Julie Ervine which involved the express or implied use of force or violence or the threat of force or violence. [¶] Before a juror may consider any such criminal act, the elements of which have been previously described to you, in your earlier set of instructions which you will have in the juryroom, as an aggravating circumstance in this case, a juror must first be satisfied beyond a reasonable doubt that the Defendant did in fact commit such criminal act."

Defendant now claims that the guilt phase instructions on assault with a deadly weapon "misstated and omitted elements of the offense." Yet the only element even mentioned by defendant in his briefing—and the only element contested by defendant at trial[20]—was intent. Defendant does not identify any specific defect in the instruction, but we observe that the jury was instructed that assault with a deadly weapon required "the general intent to willfully commit a battery, an act which has the direct, natural, and probable consequences, if successfully completed of causing injury to another. An intent to frighten or mere reckless conduct is insufficient." (See *People v. Williams* (2001) 26 Cal.4th 779, 782 [111 Cal.Rptr.2d 114, 29 P.3d 197].) Accordingly, the jury would not have considered the uncharged offense of assault with a deadly weapon as an aggravating circumstance until it had first rejected defendant's claim that the discharge of the weapon was an accident and accepted Julie's testimony that defendant's conduct was intentional.

## I. *Asserted Prosecutorial Misconduct*

Defendant assigns error to a number of statements by the prosecutor during closing argument. These statements, he claims, constituted misconduct (and thereby violated his right to due process, a fair trial, and an individualized and reliable penalty determination under the Fifth, Sixth, Eighth, and Fourteenth Amendments of the federal Constitution and corollary provisions of the California Constitution).

 A prosecutor's conduct violates the federal Constitution when it "infects the trial with such unfairness as to make the conviction a denial of due process." (*People v. Morales* (2001) 25 Cal.4th 34, 44 [104 Cal.Rptr.2d 582, 18 P.3d 11]; accord, *Darden v. Wainwright* (1986) 477 U.S. 168, 181

---

[20] Defendant testified at the guilt phase that the gun discharged by accident; Julie Ervine testified at the penalty phase that he shot the gun on purpose. Otherwise, as he concedes, "both testified that [he] pointed the gun at his wife, and that the gun discharged into a stuffed animal."

[91 L.Ed.2d 144, 106 S.Ct. 2464].) In other words, the misconduct must be "of sufficient significance to result in the denial of the defendant's right to a fair trial." (*United States v. Agurs* (1976) 427 U.S. 97, 108 [49 L.Ed.2d 342, 96 S.Ct. 2392].) A prosecutor's conduct that does not render a criminal trial fundamentally unfair violates California law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury. (*People v. Farnam* (2002) 28 Cal.4th 107, 167 [121 Cal.Rptr.2d 106, 47 P.3d 988].)

Even when misconduct has been established, "it 'must bear a reasonable possibility of influencing the penalty verdict. [Citations.] In evaluating a claim of prejudicial misconduct based upon a prosecutor's comments to the jury, we decide whether there is a reasonable possibility that the jury construed or applied the prosecutor's comments in an objectionable manner.' " (*People v. Valdez* (2004) 32 Cal.4th 73, 132–133 [8 Cal.Rptr.3d 271, 82 P.3d 296].) At the same time, we bear in mind that prosecutors "have wide latitude to discuss and draw inferences from the evidence at trial," and whether "the inferences the prosecutor draws are reasonable is for the jury to decide." (*People v. Dennis* (1998) 17 Cal.4th 468, 522 [71 Cal.Rptr.2d 680, 950 P.2d 1035].)

A defendant must timely object and request a curative instruction in order to preserve a claim of prosecutorial misconduct. (*People v. Valdez, supra*, 32 Cal.4th at p. 132.) Defendant did not interpose a contemporaneous objection and request for a curative admonition as to any the claims below, but he asks to be relieved of that obligation because, prior to argument, he filed a motion to restrict the scope of the prosecutor's penalty argument. The motion was supported by a memorandum of points and authorities, which listed at length broad categories of impermissible argument, supplied a generic curative admonition for any improper argument, and asked the court to "order the prosecutor to refrain from making any of the improper penalty arguments discussed above." One ostensible purpose for the motion was so defendant could "preserve the issue of prosecutorial misconduct for appellate review by objecting, in advance, to any such misconduct."

The trial court viewed the motion as an attempt "to avoid the potential for waiver of objection on the event of the want of objection *during the course of the argument*. And I can understand that because objections *during the penalty phase argument* could be taken for ill by a jury." The defense would still have the opportunity once the People's argument had finished (and before beginning its own argument) to alert the court to the objectionable argument and to request an appropriate admonition. We need not pass on the

validity of such a scheme because defendant never alerted the court to any perceived misconduct nor requested any curative admonition arising from the People's argument. Defendant argues instead that his lengthy preargument motion was sufficient to preserve his claim as to *any* misconduct, on the theory that he was entitled to assume that the court's silence during the People's argument indicated "that the court concluded that there was no misconduct, and that any request or further objection would have been futile."

We emphatically reject defendant's unprecedented effort to transfer the duties of defense counsel to the court. If, as defendant contends, the court agreed "that no adverse consequence would come from his foregoing [*sic*] making oral objections in the middle of argument," then defendant nonetheless had the opportunity to identify the offending remarks as soon as the People's argument had finished—and most certainly prior to the beginning of jury deliberations. To excuse defendant's failure to make a prompt postargument objection by insisting that the task of identifying improper argument and requesting a curative admonition had by then transferred entirely from defense counsel to the court by virtue of the preargument motion would permit a defendant to surrender the conduct of the entire defense prior to trial simply by pointing out the casebooks in the courtroom. We see no indication that the trial court here purported to shoulder such a responsibility on its own, nor would such a role be consistent with our system of justice.

Thus, by failing to make contemporaneous objection to any of the following comments by the prosecutor, where the record supports no contention that to do so would have been futile, defendant failed to preserve his claims of prosecutorial misconduct during penalty phase argument. (*People v. Frye* (1998) 18 Cal.4th 894, 970 [77 Cal.Rptr.2d 25, 959 P.2d 183].) Even if the claims had been preserved, none would entitle defendant to relief.

Defendant claims first that the prosecutor improperly compared the jury's oath to that taken by peace officers such as Deputy Griffith, since a jury and a peace officer have different duties. But the comparison was mainly to highlight the gravity of the oath, and the prosecutor emphasized that the jurors' duty was to "do justice." The comments cannot fairly be read to create an improper alliance between the jurors and the fallen deputy or to suggest that imposing a life sentence would be a violation of their oaths. (See *Com. v. Carson* (2006) 590 Pa. 501, 583–584 [913 A.2d 220, 268–269].) As to defendant's claim that the prosecutor improperly injected his personal belief that "justice" required a verdict of death, we note at the outset that defendant fails to identify any specific statement of such a belief. Moreover, it is not

error for "the whole thrust" of the People's argument to propose "that 'doing' justice in this case meant death, not life" or to "never argue[] that life was an appropriate sentence." Indeed, "it is not misconduct for a prosecutor in the penalty phase of a capital case to express in argument a personal opinion that death is the appropriate punishment, provided the opinion is grounded in the facts in evidence" (*People v. Mayfield, supra,* 14 Cal.4th at p. 804) or in " ' "common knowledge or . . . drawn from common experience, history or literature" ' " (*People v. Brown, supra,* 33 Cal.4th at p. 400). Finally, the prosecutor's use of "we" or "us" as a generic reference to the community was not misconduct. (*Id.* at pp. 399–400; accord, *U.S. v. Abu Ali* (4th Cir. 2008) 528 F.3d 210, 243.)

██ Defendant claims next that the prosecutor improperly attempted to appeal to the jury's passions and fears by making an "uncompromising suggestion" that the jurors' lives would be in danger if defendant were not executed. But the prosecutor's references to peace officers as "the people whose job it is to keep people like us secure" and who are needed "if we're gonna have a civilized society" were not inflammatory or prejudicial (see *People v. Ledesma* (2006) 39 Cal.4th 641, 741 [47 Cal.Rptr.3d 326, 140 P.3d 657]), nor did the prosecutor step over the line by remarking that "it's troubling for us that death can result from just a, by a callous act like this man did to Larry Griffith. That's unsettling for us." And, as defendant concedes, our prior cases have allowed the prosecutor to urge the jury to accord the defendant the same leniency the defendant granted his victim, and he offers no basis to reconsider those decisions. (E.g., *People v. Hinton, supra,* 37 Cal.4th at p. 908; *People v. Benavides, supra,* 35 Cal.4th at p. 109.)

As to the claim that the prosecutor encouraged improper double counting, defendant reiterates his claim, rejected above (see pt. III.G, *ante*) that the jury should not have been allowed to consider the special circumstance of murder to avoid arrest in addition to the special circumstance of murder of a peace officer in the line of duty. Because the jury could properly have considered both special circumstances, it was not misconduct for the prosecutor to encourage them to do so. Defendant also claims that the prosecutor improperly urged the jury to double count the assault against his wife both as a prior violent crime under section 190.3, factor (b) *and* as a circumstance of the murder under factor (a) when he referred to Julie as a victim of the capital crime. But it is plain from the argument that the prosecutor's reference to Julie, along with references to Deputy Griffith's wife, Sheriff Jarrell, and the surviving deputies, was to remind the jury of the impact of the murder on these witnesses, since Julie had testified that she begged the deputies "not to go over there" because she "was afraid for their lives." There was no attempt to double count the *assault.*

Nor do we find any effort by the prosecutor to mislead the jury as to the mitigating value of defendant's criminal history. (*People v. Osband, supra,* 13 Cal.4th at p. 709.) The prosecutor told the jury that defendant's lack of felony convictions "is a mitigating factor that you should consider on the subject of punishment" and "that should work to the defendant's benefit in your analysis." The prosecutor then argued that the factor was of little weight in this case, given defendant's current crimes, but never suggested that defendant's prior criminal history was not a mitigating factor: "For what it's worth, at this point in time now he's got four felony convictions after this trial, but for what it's worth, you give him the benefit of the doubt on factor (c), and you may consider that as some mitigation in this case."

Defendant next challenges the prosecutor's remarks that defendant was "his own Judge, jury, and executioner" and that Deputy Griffith received "no due process" and did not have the benefit of "two lawyers comin' into this courtroom with a Judge to make sure everything's right, give you appropriate instructions, have a jury decide it." Defendant contends that "[t]his argument improperly commented on [his] constitutional right to counsel, to a fair trial, and to be present." We disagree, since the argument "did not urge the jury to return a death verdict *because* defendant exercised his constitutional rights and did not suggest that defendant should be given a greater penalty *because* he had a trial." (*People v. Jackson* (1989) 49 Cal.3d 1170, 1207 [264 Cal.Rptr. 852, 783 P.2d 211]; see also *People v. Yeoman* (2003) 31 Cal.4th 93, 144–145 [2 Cal.Rptr.3d 186, 72 P.3d 1166]; accord, *People v. Ward* (2007) 371 Ill.App.3d 382, 424 [308 Ill.Dec. 899, 862 N.E.2d 1102, 1142] ["Courts have typically not found prosecutorial references to a defendant as taking on the role of judge and jury to be erroneous."].)

Finally, we reject defendant's claim that the prosecutor acted improperly in excluding the evidence that defendant was remorseful and believed the death penalty was appropriate (see pt. III.B, *ante*) and then arguing to the jury that defendant had failed to take "full responsibility" for his crime. A review of the argument reveals that the prosecutor never contended that defendant was not remorseful. Rather, the prosecutor sought to remind the jury that defendant had never admitted the obvious fact that defendant knew at the time that the people he was shooting at were peace officers: "Ask yourself, does he really truly deserve our sympathy? [¶] I mean, if he thought that he was going to be macho enough and man enough to kill in cold blood, calculatedly to take another human being's life, you know, to become the Judge, the jury and that executioner, then he ought to be man enough to accept full responsibility and the penalty that the law says that he ought to get. He ought to be man enough to do that. [¶] The trouble is he wasn't and he isn't though. That's part of the trouble here because you remember the evidence in the case? [¶] He knew they were gonna come and get him. He knew he was gonna do his standoff with 'em there. He was gonna kill 'em all." This was

fair comment on defendant's refusal to admit "full responsibility" for what he did. Furthermore, the jury could not have been misled, since it did hear evidence from defendant that he was remorseful and had wished he could trade places with Deputy Griffith.

### J. *Constitutionality of the Death Penalty Statute*

Defendant contends that various features of California's death penalty statute violate the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution and parallel provisions of the state Constitution. We have repeatedly rejected such claims in prior decisions, and defendant's argument offers no grounds for reconsidering these holdings.

Thus, we reject defendant's claim that the use of the word "extreme" in section 190.3, factor (d) prevented jury consideration of relevant mitigating evidence (*People v. Stanley* (2006) 39 Cal.4th 913, 963 [47 Cal.Rptr.3d 420, 140 P.3d 736]); that the instructions were deficient in failing to identify which factors were aggravating and which were mitigating (*People v. Catlin* (2001) 26 Cal.4th 81, 178 [109 Cal.Rptr.2d 31, 26 P.3d 357]) or that certain factors could only be mitigating (*People v. Morrison* (2004) 34 Cal.4th 698, 730 [21 Cal.Rptr.3d 682, 101 P.3d 568]); that factor (a) of section 190.3 is unconstitutionally vague and permits arbitrary and capricious application of the death penalty (*Tuilaepa v. California* (1994) 512 U.S. 967, 987–988 [129 L.Ed.2d 750, 114 S.Ct. 2630]; accord, *People v. Hinton, supra*, 37 Cal.4th at p. 913); that factor (b) of section 190.3 and the reliance on unadjudicated conduct render the death penalty arbitrary and unreliable (*Tuilaepa v. California, supra*, 512 U.S. at pp. 976–977); accord, *People v. Elliot* (2005) 37 Cal.4th 453, 488 [35 Cal.Rptr.3d 759, 122 P.3d 968]); that the instructions were deficient in failing to inform the jury that the mitigating circumstances need not be found unanimously or demonstrated by any particular standard of proof (*People v. Rogers* (2006) 39 Cal.4th 826, 897 [48 Cal.Rptr.3d 1, 141 P.3d 135]); that CALJIC No. 8.88 misstates the nature and scope of the jury's sentencing discretion (*People v. Friend* (2009) 47 Cal.4th 1, 90 [97 Cal.Rptr.3d 1, 211 P.3d 520]; *People v. Cornwell* (2005) 37 Cal.4th 50, 103 [33 Cal.Rptr.3d 1, 117 P.3d 622]; *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 123 [17 Cal.Rptr.3d 710, 96 P.3d 30]); that the jury needed to reach unanimous agreement on the aggravating circumstances (*People v. Bolden* (2002) 29 Cal.4th 515, 566 [127 Cal.Rptr.2d 802, 58 P.3d 931]); and that the jury should have been instructed as to the burden or standard of proof in selecting the penalty to be imposed (*People v. Stanley, supra*, 39 Cal.4th at p. 964). " 'Nothing in *Cunningham v. California* (2007) 549 U.S. 270 [166 L.Ed.2d 856, 127 S.Ct. 856], *Apprendi v. New Jersey* [(2000)] 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348], or *Ring v. Arizona* [(2002)] 536 U.S.

584 [153 L.Ed.2d 556, 122 S.Ct. 2428], affects our conclusions in these regards.' " (*People v. Curl* (2009) 46 Cal.4th 339, 362 [93 Cal.Rptr.3d 537, 207 P.3d 2].)

We also reject defendant's claim that the instructions were defective in failing to create a presumption in favor of a life sentence (*People v. Vieira* (2005) 35 Cal.4th 264, 301 [25 Cal.Rptr.3d 337, 106 P.3d 990]); that the jury was required to make express findings as to the presence of aggravating circumstances or the absence of mitigating circumstances (*People v. Bunyard* (2009) 45 Cal.4th 836, 861 [89 Cal.Rptr.3d 264, 200 P.3d 879]); that section 190.3 is unconstitutional for failing to require intercase proportionality review or disparate sentence review (*People v. Romero* (2008) 44 Cal.4th 386, 429 [79 Cal.Rptr.3d 334, 187 P.3d 56]); that the death penalty law deprives capital defendants of equal protection (*People v. Hinton, supra,* 37 Cal.4th at p. 913); and that defendant's sentence violates international law (*People v. Boyer, supra,* 38 Cal.4th at p. 489).

K. *Asserted Error in CALJIC No. 8.85 and Failure to Give Clarifying Instructions Proposed by the Defense*

The jury was instructed in accordance with CALJIC No. 8.85, which instructed the jury to consider, take account of, and be guided by, inter alia, "the circumstances of the crime of which the Defendant was convicted in the present proceeding and the existence of any special circumstances found to be true." This language closely tracks factor (a) of section 190.3, and we have repeatedly upheld it against the claim that it permits the jury to double count the circumstances of the crime that are also special circumstances (e.g., *People v. Gutierrez, supra,* 45 Cal.4th at p. 831), since the possibility the jury would believe it could weigh each special circumstance twice on the penalty scale is "remote." (*People v. Monterroso* (2004) 34 Cal.4th 743, 790 [22 Cal.Rptr.3d 1, 101 P.3d 956].) The prosecutor's argument—which tracked the language of the instruction and discussed the special circumstances without ever suggesting the jury double count them—does not change the calculus. (*Ibid.*)

Defendant did ask for, and the trial court refused, this instruction clarifying the jury's task: "You must not consider as an aggravating factor the existence of any special circumstance if you have already considered the facts of the special circumstance as a circumstance of the crime for which the defendant has been convicted. In other words, do not consider the same factors more than once in determine [*sic*] the presence of aggravating factors." (See *People v. Monterroso, supra,* 34 Cal.4th at pp. 789–790.) Because the prosecution argument did not transgress those parameters, though, the absence of the instruction could not have misled the jury. (*People v. Chatman* (2006) 38 Cal.4th 344, 409 [42 Cal.Rptr.3d 621, 133 P.3d 534].)

Finally, we find no error in the trial court's refusal to give defendant's other proposed instruction, which read as follows: "You may not treat the verdict and finding of first degree murder committed under [a] special circumstance[s], in and of themselves, as constituting an aggravating factor. For, under the law, first degree murder committed with a special circumstance may be punished by either death or life imprisonment without possibility of parole. [¶] Thus, the verdict and finding which qualifies a particular crime for either of these punishments may not be taken, in and of themselves, as justifying one penalty over the other. You may, however, examine the evidence presented in the guilt and penalty phases of this trial to determine how the underlying facts of the crime bear on aggravation or mitigation." As we recently explained, "this instruction was unnecessary," since the instructions already given adequately conveyed to the jury that it was required to consider the facts underlying the convictions and special circumstance findings, not the mere existence of the convictions and findings. (*People v. Farley* (2009) 46 Cal.4th 1053, 1132 [96 Cal.Rptr.3d 191, 210 P.3d 361]; see also *People v. Lenart* (2004) 32 Cal.4th 1107, 1132 [12 Cal.Rptr.3d 592, 88 P.3d 498].) And the "proposed instruction was misleading to the extent it contradicted instructions directing the jury to consider the circumstances of the crime and the existence of any special circumstance." (*Farley, supra,* 46 Cal.4th at p. 1132; see also *Lenart, supra,* 32 Cal.4th at p. 1133.)

### L. *Assertedly Improper Consideration of the Special Circumstance of Murder to Avoid Arrest*

Defendant also complains that the jury should not have been permitted to rely on the existence of the special circumstance of murder to avoid arrest as an aggravating factor in addition to the special circumstance of murder of a peace officer in the line of duty. The premise for his argument is that the former "overlapped with and duplicated" the latter. Because we rejected that premise in part III.G, *ante,* it follows that this argument fails as well.

### M. *Cumulative Error*

Defendant argues that the cumulative effect of the errors at his penalty trial requires reversal of his sentence of death. We disagree. The few nonprejudicial individual errors we have found are no more compelling when considered in combination, and defendant does not explain how these errors would reinforce a compelling theory of prejudice or undermine the prosecution's case against him. Their cumulative effect does not warrant reversal of the judgment.

**DISPOSITION**

The judgment is affirmed.

George, C. J., Kennard, J., Werdegar, J., Chin, J., Moreno, J., and Corrigan, J., concurred.

Appellant's petition for a rehearing was denied February 3, 2010. George, C. J., did not participate therein.